## WHITE EARTH BAND OF OJIBWE
## IN TRIBAL COURT

MANOOMIN; THE WHITE EARTH
BAND OF OJIBWE; MICHAEL
FAIRBANKS; LEONARD 'ALAN' ROY;
RAYMOND AUGINAUSH; KATHY
GOODWIN; CHERYL 'ANNIE'
JACKSON; TODD JEREMY THOMPSON;
DAWN GOODWIN; NANCY BEAULIEU;
WINONA LADUKE; PATRICIA 'ALEX
GOLDEN-WOLF' OSUNA;  JUSTIN
KEEZER;  TANIA AUBID; SIMONE
SENOGLES; GINA (PELTIER) EELE;
TARA WIDNER; TARA HOUSKA;
JAMIE "JAIKE SPOTTED-WOLF"
WORTHINGTON and other tribal members
and Water Protectors similarly situated, and          Civil Case No. _____
SHANAI MATTESON and ALLEN
RICHARDSON invited non-Indian guests
and Water Protectors similarly situated,
                    Plaintiffs
**v.**

MINNESOTA DEPT of NATURAL                    **COMPLAINT**
RESOURCES (DNR); COMMISSIONER
SARAH STROMMEN; RANDALL                              for
DODEEN DNR, EWR CAR SECTION
MANAGER (Ecological and Water          Declaratory and Injunctive Relief
Resources Conservation Assistance and
Regulation Section Manager), and BARB
NARAMORE, DEPUTY
COMMISSIONER, DNR
CONSERVATION OFFICERS (arresting or
threatening tribal water protectors) JOHN
DOES? (1 -10),
                    Defendants.

_____

### *Introduction*

Manoomin (Wild Rice), *the food that grows on water*, is the most important

cultural and sacred food of the Chippewa, Ojibwe, Anishinabe peoples.  Manoomin has

been a part of our traditional stories, teachings, lifeways and spirituality since the earliest times to the present day.  For the Chippewa Manoomin is alive like all living creatures and they are our relations.  We Chippewa have a sacred covenant with Manoomin and the water (Nibi) and all living creatures, without which we cannot live.

*Manoomin's* story is revealed as part of our migration story and the *Seven Fires Prophecy* which tells of the westward migration from the Atlantic coast, through the Great Lakes to our current homelands and territories of the **Chippewas of the Mississippi**. Birch scroll maps show the waterways and portages of the route from old Fond du Lac to the homelands of the *Chippewas of the Mississippi* at Sandy Lake and Leech Lake.  At the center of the map is old Fond du Lac[1] (now Jay Cook state park) next to the major landmark peninsula now Park Point Duluth on Lake Superior.



For the Chippewa, Manoomin is a gift from the Creator and because of this spiritual connection and relationship with Manoomin the Chippewas expressly reserved the right

---

[1] Old Fond du Lac was originally located near the mouth of the now St. Louis River freshwater estuary of Lake Superior.  Old Fond du Lac is the meeting location of 1826 Ratification Treaty https://www.firstpeople.us/FP-Html-Treaties/TreatyWithTheChippewa1826.html (of 1825 Treaty) with the United States.  This is the site of a major Chippewa Indian settlement from the sixteenth through the nineteenth centuries and is situated on the early canoe route along the St. Louis River from Lake Superior to Lake Vermillion and the Upper Mississippi. See historical marker https://www.hmdb.org/m.asp?m=43723 The 1825 Treaty included a dozen tribes.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 2.

to gather *wild rice* in the 1837 Treaty[2] with the United States.  Manoomin is our primary

treaty food, along with fish and maple.  From time immemorial the wild rice crop of the

waters of the *now* states of Minnesota, Wisconsin and Canada has been a vital factor to

the sustenance and the continued existence of the Indian race in the territory.[3]

> WILD RICE, OR MANOOMIN, IS CENTRAL TO OJIBWE CULTURAL
> IDENTITY, SPIRITUAL TRADITIONS, AND PHYSICAL WELL-
> BEING. IT IS AN IMPORTANT SPECIES TO THE ECOLOGY OF
> MINNESOTA'S LAKES AND RIVERS AND PROVIDES CRITICAL
> FOOD AND HABITAT TO BOTH ENDEMIC AND MIGRATORY
> SPECIES.[4]

Manoomin, fish and maple are the primary treaty foods of the Chippewa, all of

which depends on clean, abundant fresh waters and which important and essential

natural ecosystem resources have been under constant threat from Minnesota

permitting agencies inability or unwillingness to protect or work with affected

tribes.[5]

---

[2] See Article 5 of the 1837 treaty provides, "The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers, and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." Treaty with the Chippewa, July 29, 1837, art. 5, 7 Stat. 536 ("1837 Treaty").
https://glifwc.org/TreatyRights/TreatyChippewa07291837Web.pdf
[3] See Minn. Stat. 84.09 Conservation of wild rice, adopted 1939, repealed 1996.
[4] See *The Food that Grows out of the Water, The Economic Benefits of Wild Rice in Minnesota*, Earth Economics 2018, by Angela Fletcher, Olivia Dooley, Johnny Mojica, and Jessie Martin, Executive Summary page 3. WQSWildRiceBenefits.pdf (fdlrez.com) (Thanks to all who supported this project: Nancy Schuldt and Thomas Howes of the *Fond du Lac Band of Lake Superior Chippewa*; James Thannum and Peter David of the *Great Lakes Indian Fish and Wildlife Commission*; Darren Vogt of the *1854 Treaty Authority*; Kathleen Williams of the *Environmental Protection Agency*; Kristin Raab of the *Minnesota Department of Health*; Maya Kocian, Cyrus Philbrick, Matt Chadsey, Ruby Ellis, and Marvin Termin of *Earth Economics*.)
[5] See The Wild Rice Mystique: Resource Management and American Indians' Rights as a Problem of Law and Culture, William Mitchell Law Review, Vol. 10, p. 743, 1984, by Charlene L. Smit, Washburn University - School of Law, and Howard J. Vogel, Hamline University -

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 3.

In *U.S. v. Brown*[6], the Eighth Circuit re-affirmed that

> When seeking to determine the meaning of Indian treaties, "we look beyond the written words to the larger context that frames the Treaty, including the history of the treaty, the negotiations, and the practical construction adopted by the parties." Mille Lacs Band, 526 U.S. at 196 (quotation omitted). We interpret such treaties liberally, resolving uncertainties in favor of the Indians, and we "give effect to the terms as the Indians themselves would have understood them." Id. at 196, 200.

As such, the panel considered the Treaty Journals noting that

> In July 1837, over one thousand Chippewa Indians gathered at Fort Snelling while their chiefs negotiated with Wisconsin Territorial Governor Henry Dodge who represented the United States. Documents Related to the Negotiation of the Treaty of July 29, 1837, reprinted in Satz, Chippewa Treaty Rights 131-153, at 131 ("1837 Treaty Journal"). The United States sought to purchase land east of the Mississippi River in present day central Minnesota and Wisconsin because of its desirable pine timber. Id. at 131-32, 140.

> During these negotiations, the Chippewa chiefs emphasized the importance of reserving their rights to fish, hunt, and gather on the land, also called usufructuary rights. According to the treaty journal, *Ma-ghe-ga-bo* stated, "Of all the country that we grant to you we wish to hold on to a tree where we get our living, & to reserve the streams where we drink the waters that give us life." 1837 Treaty Journal at 142. The secretary who recorded the proceedings noted that he transcribed the statement as provided by the underqualified interpreters, but he "presume[d] it to mean that the Indians wish to reserve the privilege of hunting & fishing on the lands and making sugar from the Maple." Id.

---

School of Law (Abstract-This article posits that the current controversy concerning wild rice is best understood as a clash between the traditional Ojibway culture and the culture of the European settlers. It provides an extensive historical and scientific background for this thesis. In doing so it provides a critique of regulation of the wild rice harvest in the State of Minnesota and concludes with suggestions for improved wild rice resource management in Minnesota.) https://open.mitchellhamline.edu/wmlr/vol10/iss4/6/
[6] See https://turtletalk.files.wordpress.com/2016/09/8th-circuit-opinion-upheld-square-hook-chippewa-treaty-rights-2-10-2015.pdf  *U.S. v Brown et al.*

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 4.

And the Minnesota District Court for *U.S. v Brown*[7] considered the same Treaty Journals

and cited

> Chippewa leader **Hole in the Day** stated: "==My father, in all the country we== ==sell you, we wish to hold on to that which gives us life – the streams and== ==lakes where we fish, and the trees from which we make sugar.==" Henry Dodge, Proceedings of a Council with the Chippewa Indians, 9 Iowa J. Hist. & Pol. 408, 424 (1911). Governor Henry Dodge of Wisconsin Territory, which in 1837 included all of the future State of Minnesota, later responded that "I will agree that you shall have the free use of the rivers and the privilege of hunting on the lands you are to sell, during the pleasure of your great father." Id. at 427. Another Chippewa leader, **Flat Mouth**, a chief from Leech Lake, stated:
>
> > ==Your children are willing to let you have their lands, but wish to== ==reserve the privilege of making sugar from the trees, and getting== ==their living from the lakes and rivers as they have heretofore done,== ==and of remaining in the country. It is hard to give up the land. It== ==will remain and cannot be destroyed, but you may cut down the== ==trees, and others will grow up. You know we cannot live deprived== ==of lakes and rivers.==
>
> Id. at 428. Governor Dodge responded to this: "My friends, I have listened with great attention to your chiefs from Leech Lake. I will make known to your great father your request to be permitted to make sugar on the lands, and you will be allowed during his pleasure to hunt and fish on them." Id. at 429.

Here, the Treaty Journals reveal our Chippewa understandings about usufructuary

property rights across all the lands and waters being ceded and yet to be ceded[8] and held

*in common* by the Chippewas of the Mississippi and Lake Superior, as described in the

---

[7] See MEMORANDUM OPINON AND ORDER REJECTING THE REPORTS AND RECOMMENDATIONS OF THE MAGISTRATE JUDGE, 11/25/2013, *U.S. v. Brown* Criminal No. 13-68 (JRT/LIB), https://anishinaabeperspectives.weebly.com/blog/us-court-decision-regarding-leech-lake-usufructuary-treaty-rights Similar decisions dismissing Chippewa at Red Lake and White Earth Netters after Operation SquareHook fiasco by DNR charging on and off reservation Indians (with U.S. Fish & Wildlife) for selling fish on and off reservations.
[8] See https://scholarship.law.umn.edu/cgi/viewcontent.cgi?article=1222&context=lawineq *Minnesota v. Mille Lacs Band of Chippewa: 19th Century U.S., Treaty Guaranteed Usufructuary Property Rights, the Foundation for 21st Century Indigenous Sovereignty*, by Peter Erlinder. June 2015, Minnesota Journal of Law & Inequality, Volume 33 Issue 1 Article 3.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 5.

1842 Treaty with the Chippewa[9].  Chippewa treaty-reserved usufructuary property rights are exclusive[10] from the State of Minnesota and the United States, and thus requires consent from the Chippewa.

The White Earth Band of Ojibwe together with the Minnesota Chippewa Tribe (MCT) and Honor the Earth[11] developed the *Anishinabe Cumulative Impact Assessment* (ACIA)[12] in 2018 (and e-filed the entire ACIA onto the Minnesota Public Utilities Commission's Line 3 e-docket)[13] as part of the PUC's Environmental Impact Statement (EIS) for Line 3 tar sands, crude oil pipeline.  The ACIA agrees with the United States, the other party to 44 treaties with Chippewa, that *climate change* is our biggest national security threat explaining in 2014 that

> The responsibility of the Department of Defense is the security of our country. That requires thinking ahead and planning for a wide range of contingencies.
>
> Among the future trends that will impact our national security is climate change. Rising global temperatures, changing precipitation patterns, climbing sea levels, and more extreme weather events will intensify the challenges of global instability, hunger, poverty, and conflict. They will likely lead to food and water shortages, pandemic disease, disputes over

---

[9] See https://glifwc.org/TreatyRights/TreatyChippewa10041842Web.pdf

[10] See *U.S. v Brown* (Mn Dist) FN 7, citing *U.S. v Dion* "As a general matter, 'Indians enjoy exclusive treaty rights to hunt and fish on lands reserved to them, unless such rights were clearly relinquished by treaty or have been modified by Congress.' *Dion,* 476 U.S. at 738. These fishing rights are held individually by Defendants, as treaty rights can be asserted by individual tribe members." *Id.* at 738 n.4.

[11] See https://www.honorearth.org/ a native-led environmental organization based on White Earth Reservation

[12] https://www.mnchippewatribe.org/impact_assessment.html

[13] See PUC e-docket Feb. 26, 2018 for Enbridge 15-137 Line 3, see ten (10) documents 20182-140455-01 through 20182-140455-10.
https://www.edockets.state.mn.us/EFiling/edockets/searchDocuments.do?method=showPoup&documentId={9080D261-0000-CB10-9584-1E2E901BC5B7}&documentTitle=20182-140455-01

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 6.

refugees and resources, and destruction by natural disasters in regions across the globe.

> In our defense strategy, we refer to climate change as a "threat multiplier" because it has the potential to exacerbate many of the challenges we are dealing with today – from infectious disease to terrorism. We are already beginning to see some of these impacts.

See ***Department of Defense FY 2014 Climate Change Adaptation Roadmap***.[14] Today, all of the possible impacts described in the 2014 DOD report above are already reality and happening in the state of Minnesota, the U.S. and the World.

Most recently, the Minnesota Department of Natural Resources (DNR) has abruptly, unilaterally and without formal notice to tribal leaders (quasi-secretly), *and without Chippewa consent*, granted Enbridge Line 3 project an increase of approximately 5 billion gallons of public ground and surface water, for horizontal drilling under rivers and other waterways of the upper Mississippi watershed.  The Band and other Chippewas have been attempting to protect Manoomin and our fresh water resources by engaging, albeit unsuccessfully, in direct dialog with DNR to rescind the 5B water permit, and by establishing treaty camps for Water Protectors.  Chippewa Water Protectors have been arrested and charged for *trespass* under state criminalization of civil rights and laws, for defending our usufructuary properties and fresh clean waters to support the *Rights of*

---

[14] See Department of Defense FY 2014 Climate Change Adaptation Roadmap  prepared under DOD Secretary Hagel, https://www.acq.osd.mil/eie/Downloads/CCARprint_wForward_e.pdf

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 7.

*Manoomin* and for all living creatures whose lives depend on an abundant quantity of clean pristine high quality, fresh water resources.[15]

"We trust the United States Forest Service to 'speak for the trees, for the trees have no tongues.' Dr. Seuss, The Lorax (1971)."[16]  In 2018, in a *slightly* different petroleum pipeline story a Fourth Circuit federal court judge noted that

> A thorough review of the record leads to the necessary conclusion that the Forest Service abdicated its responsibility to preserve national forest resources. This conclusion is particularly informed by the Forest Service's serious environmental concerns that were suddenly, and mysteriously, ***assuaged in time to meet a private pipeline company's deadlines.***

(Emphasis added).

Here and now, it's the DNR abdicating its responsibilities to the public's interest, suddenly and mysteriously, and the DNR is failing to protect freshwater resources for Manoomin and the rest of Nature's creations, with callous disregard for the Rights of

---

[15] See *White Earth Nation and 1855 Treaty Authority Pass Laws to Protect the "Rights of Manoomin"* Jan. 14, 2019 https://www.stopline3.org/news/rightsofmanoomin
[16] See *Sierra Club et al v U.S. Forest Service et al, Atlantic Coast Pipeline, LLC, Intervenor*, (4th Cir. No. 18-1144) On Petition for Review of a Decision of the United States Forest Service order by the Honorable Circuit Judge Thacker:  See USCA4 Appeal: 18-1144 Doc: 104 Filed: 12/13/2018 Pg: 60 of 60, Part IV, Petition for Review Granted, Vacated and Remanded. https://www.southernenvironment.org/uploads/words_docs/ACP_USFS_opinion.pdf (We trust the United States Forest Service to "speak for the trees, for the trees have no tongues." Dr. Seuss, The Lorax (1971).  A thorough review of the record leads to the necessary conclusion that the Forest Service abdicated its responsibility to preserve national forest resources. This conclusion is particularly informed by the Forest Service's serious environmental concerns that were suddenly, and mysteriously, assuaged in time to meet a private pipeline company's deadlines. Accordingly, for the reasons set forth herein, we grant the petition to review the Forest Service's Record of Decision and Special Use Permit, vacate the Forest Service's decisions, and remand to the Forest Service for proceedings consistent with this opinion.)

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 8.

Nature[17], Rights of Manoomin and Rights of the Chippewas reserved by a series of 44

Treaties with the United States, simply to enable and facilitate climate change threats for

a different, foreign, tar sands crude oil pipeline called Line 3 Replacement.[18]  DNR state

oppression, and imperialism fosters and enforces cultural genocide in Minnesota.[19]

The Chippewas have pre-existing usufructuary and water property rights that have

been intentionally and systematically ignored and suppressed by the state and particularly

the DNR with other law enforcement for profit.[20]  The 2020 Minnesota Legislature has

*severely criminalized* citizens' civil rights to travel, the right to assemble, free speech and

other civil remedies used to defend public and private property rights and interests.  DNR

and local law enforcement are violating Chippewa federally protected civil rights of

Water Protectors at Shell River[21], Giniw[22], Firelight[23], Treaty People Gathering[24],

---

[17] See *Global Alliance for the Right of Nature* https://www.therightsofnature.org/ and see also
*Center for Environmental and Democratic Rights* https://www.centerforenvironmentalrights.org/
[18] See *On Nature column: Pursuit of oil continues to destroy land, water. Song remains the
same!* By Eliot Reed, For The Herald Bulletin, Jul 31, 2021. (Today, more than 250 water
protectors and other protestors have been arrested. Former 1996 and 2000 Vice Presidential
candidate Winona LaDuke (Green Party) of the White Earth Ojibwe Nation was one of the water
protectors jailed.
Multinational companies continue their race for profits as the climate crisis relentlessly threatens
all of humanity. ***Regardless of whether Obama, Trump or Biden is president, the song remains
the same****.*) https://www.heraldbulletin.com/opinion/columns/on-nature-column-pursuit-of-oil-
continues-to-destroy-land-water/article_fbf829f0-f08b-11eb-9c7e-6bd21fc94f7a.html
[19] See *'It's cultural genocide': inside the fight to stop a pipeline on tribal lands, The Line 3 route
traverses land that Native American pipeline opponents say is protected by US treaties with
Ojibwe nations*, by Sheila Regan in Minnesota https://www.theguardian.com/us-
news/2021/feb/19/line-3-pipeline-ojibwe-tribal-lands
[20] See *MN law enforcement has been paid nearly $1.7 M from Line 3 escrow account*
https://healingmnstories.wordpress.com/2021/08/03/mn-law-enforcement-has-been-paid-nearly-
1-7-m-from-line-3-escrow-account/
[21] See *Women arrested defending the Shell River*
https://mail.google.com/mail/u/0/?pli=1#inbox/FMfcgzGkZZwLCQGrzGkcBwddFjznPDvc?proj
ector=1

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 9.

Mississippi River Lodge[25], and Red Lake River[26] Treaty Camps[27] for Water Protectors. Presently more than 700 arrests have been made by DNR and local law enforcement.

  *Trespass* is civil regulatory in nature and more importantly *Prohibited Trespass* is an existing offense in the 1855 Conservation Code[28] adopted by the White Earth Band in 2010.  Minnesota is infringing on Chippewa's civil rights, U.S. Constitutional rights, treaty and reserved rights, by systematically using DNR Conservation Officers and state law enforcement to protect the worst, climate change culprits to unjustly take excessive amounts of surface and ground water, during a drought just before Manoomin harvest

---

[22] See *Blocking Machinery With Their Bodies: Inside The Fight Against An Oil Pipeline*, https://www.youtube.com/watch?v=JZTmXkW5VqI

[23] See *Firelight Action* https://www.youtube.com/watch?v=jVWJk8kM12E On 07/29/2021 Water Protectors blocked access to a water pump on the Mississippi River near the FIrelight Treaty Camp. Two were arrested and 4 were cited when the refused to move away from the pump.  See also *Bad Ass Grandma Arrest Firelight Camp* https://mail.google.com/mail/u/0/?pli=1#inbox/FMfcgzGkZZwLCQGZSnQChGCPkCbBltMP?projector=1

[24] See *Treaty People Gathering Action at the Headwaters of the Mississippi River* https://www.bing.com/videos/search?q=treaty+people+gathering+youtube&docid=608002047360921713&mid=A0C1E0C7305587C520A1A0C1E0C7305587C520A1&view=detail&FORM=VIRE

[25]  See *Taysha Martineau and Winona LaDuke at the lodge* https://www.youtube.com/watch?v=bk9b-2YuTTM

[26] See *UPDATE: Weekend Arrests At Pipeline Protest Camp By Thief River Falls, MN* https://mail.google.com/mail/u/0/?pli=1#inbox/FMfcgzGkZZwLCSVlvhMkGxpMTDszXKDt?projector=1

[27] See *Indigenous people in Minnesota arrested for protesting the Line 3 pipeline at Red Lake Treaty Camp* https://www.youtube.com/watch?v=g0P-k6uc4x4

[28] See WERBC Res. 057-10-008, adopted Conservation Code for the 1855 Ceded Territory Tribes.  The 1855 Conservation Code is nearly identical to the 1854 Conservation Code.  The 1854 Conservation Code includes the offense of *prohibited trespass*.  Minnesota already financially compensates the 1854 treaty bands, in excess of $15 Million per bi-annually to not exercise their off-reservation, commercial harvesting rights. See Minn. Stat. 97A.157, 1854 TREATY AREA AGREEMENT https://www.revisor.mn.gov/statutes/2019/cite/97A.157/pdf

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 10.

season. Meanwhile Enbridge is using militarized[29] security forces and is reportedly bringing in tankers of water from other, known and unknown, cross contaminating water sources to continue construction and drilling[30] day and night during the drought.

### COMPLAINT

This is an action for declaratory and injunctive relief by which Plaintiffs *Manoomin*, the White Earth Band of Ojibwe (the "Band") of the Minnesota Chippewa Tribe, on the White Earth Reservation, and individual Chippewa (and other tribes who are a party to the same 1825 and 1826 treaties) *Treaty Beneficiaries* and (members) and non-Indian Water Protectors *generally* seek declaratory and injunctive relief to:

a. *Declare* Manoomin, or wild rice, within all the Chippewa ceded territories is protected and possesses inherent rights to exist, flourish, regenerate, and evolve, as well as inherent rights to restoration, recovery, and preservation. These rights include, but are not limited to, the right to pure water and freshwater habitat; the right to a healthy climate system and a natural environment free from human-caused global warming impacts and emissions;

b. *Declare* that Plaintiff tribal members possess the individual legal rights to harvest manoomin, and protect and save manoomin seeds, and protect the waters that support Manoomin within the 1855 ceded territory and beyond, free of DNR interference and regulation.

c. *Declare* the Chippewa Plaintiffs as individual *Chippewas of the Mississippi* and the political successor, federally recognized tribal government of the

---

[29] See *Just Out of Jail, Winona LaDuke Decries Militarized Crackdown on Enbridge Line 3 Pipeline Protests*, DemocracyNow, https://www.youtube.com/watch?v=KRwjWJzwNls
[30] See *Drilling Fluid Used in Line 3 Construction Released Near Solway* Lakeland Public TV https://mail.google.com/mail/u/0/?pli=1#inbox/FMfcgzGkZZwLCWvRPnTXdtJkkvcBgPlg?projector=1

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 11.

White Earth Reservation have *recognized legal rights* to lands and waters that pre-date treaties and Minnesota statehood and are derived from the individually held, treaty reserved, usufructuary property rights necessary to support healthy ecosystems from which to provide on-going food security to hunt, fish, trap and gather; which rights are protected by U.S. Constitutional due process, as part of the supreme law of the land.

d.  *Declare* that Chippewas (and related 1825-26 treaty beneficiaries) individually, and collectively as historic Bands, have a right to invite guests to their various waters and lands associated public properties, and that invited guests both tribal and non-tribal have a right, if not intrinsic duty as invited guests to help defend endangered Chippewa property rights and interests. (ie. house/car on fire, help put fire out).

e.  *Declare* that Defendants individually and collectively knew or should have known their 5 Billion gallons of water grant was without the free, prior, informed consent[31] of the *Manoomin* and historic treaty bands and members of the *Chippewas of the Mississippi* and present day political successor tribal government at White Earth Reservation.

f.  *Declare* that Defendants are collectively and intentionally engaged in a pattern and practice of impermissibly infringing on and circumventing important Congressionally protected Chippewa treaty rights expressly protected under Public Law 280(b) whereby

> **Nothing in this section shall authorize the alienation**, encumbrance, or taxation **of any real or personal property, including water rights, belonging to any Indian or any Indian tribe, band, or community** that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; **or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty**, agreement, or

---

[31] See United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP) https://www.un.org/development/desa/indigenouspeoples/declaration-on-the-rights-of-indigenous-peoples.html

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 12.

==statute or with any regulation made pursuant thereto==; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

g. *Declare* Defendant state of Minnesota is willfully and intentionally engaged in civil rights deprivations against the Chippewas, other tribal members and invited guests, with regard to the free exercise and enjoyment of federally protected, treaty-recognized water property rights necessary to support the inherent and usufructuary property rights to hunt, trap, fish and gather *Manoomin* under: the 1855 Treaty (10 Stat. 1105); the 1837 Treaty (7 Stat., 536); the 1825 Treaty (7 Stat. 272) and the 1826 Treaty (7 Stat. 290); the American Indian Religious Freedoms Act; the First Amendment; Fourth Amendment; Fifth Amendment; Due Process Clause; and, Equal Protection Clause of the Fourteenth Amendment, which all violates 42 U.S. Code § 1983, for Civil action for deprivation of rights. Minnesota is interfering with the rights of tribes to make their own laws and to be ruled by them, by misappropriating 5B gallons of water and jeopardizing and endangering Manoomin and using police powers to enforce unjust state laws.

h. *Declare* intentional interference by the state of Minnesota with regard to the exercise of federally protected, treaty-recognized water property rights necessary to support the inherent and usufructuary property rights to hunt, fish and gather under the 1855 Treaty (10 Stat. 1105); the 1825 Treaty (7 Stat. 272) and/or the 1826 Treaty (7 Stat. 290); the First Amendment; Fourth Amendment; Fifth Amendment; Due Process Clause; and Equal Protection Clause of the Fourteenth Amendment, by arbitrarily, picking and choosing which Chippewa treaty tribes may enjoy and protect their usufructuary and water rights unmolested by DNR Conservation Officers.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 13.

i.  *Declare* the DNR has intentionally and knowingly violated the **Rights of Manoomin** by unilaterally granting 5 billion gallons of water, without official notice to tribes, without Chippewa consent, on and off White Earth Reservation in the Chippewa treaty ceded territories.  See Exhibit A. *Water Report: "What happens when the water goes down?"* By Renee L. Keezer, Pesticide Coordinator WE Natural Resources to Monica Hedstrom-Director, Director, WE Natural Resources dated July 16, 2021, RE: Minnesota Department of Natural Resources, *Amended Water Appropriation Permit #2018-3420, 5 billion gallons of water for Enbridge Line 3*, Summary and Comments.

j.  *Enjoin Defendants DNR to provide injunctive relief* to nullify Water Appropriation Permit No. 2018-3420 immediately to prevent further, continued waste of fresh water resources, both surface and groundwater, on reservation and across the ceded territories (necessary for the Manoomin to live and flourish; and so tribal members may enjoy their rights to harvest manoomin), by the Defendants Minnesota Department of Natural Resources (the "DNR") officials who unilaterally granted an increase to 5 billion gallons of water, up from a 0.5 billion gallons of water for total 10 fold increase, for Line 3, see https://files.dnr.state.mn.us/features/line3/decisions/04june2021-update-trench-watering-decisions.pdf Water Appropriation Permit No. 2018-3420 Enbridge Line 3 Replacement Project, dated June 4, 2021.

### Background History

1.  The Chippewa and the White Earth Band have been involved in the pipeline regulatory process at the PUC for nearly 8 years.[32]   The DNR has continued to

---

[32] Most recently, *Bench & Bar* published 2 articles analyzing and questioning Minnesota Public Utilities Commission decision making on behalf of public's interest and environmental racism in

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 14.

disregard and disrespect parity recognition of Chippewa usufructuary rights in the 1855 ceded territory[33] on par with the 1837 and 1854 ceded territories DNR recognition of usufructuary rights.

---

the routing Line 3 pipeline through Chippewa territories in the May/June 2021 edition https://www.mnbar.org/resources/publications/bench-bar/issues/may-june-2021/2021/05/26/when-the-public-interest-isn-t-minnesota-s-approval-of-a-new-line-3 and see also part 2 in the July 2021 https://www.mnbar.org/resources/publications/bench-bar/2021/07/01/we-live-not-alone-a-legacy-of-environmental-racism

In 2014, the White Earth Band of Ojibwe (the "Band") intervened and joined other Ojibwe (Chippewa) Anishinabe tribal governments and environmental intervenor groups (like Honor the Earth based on White Earth Reservation) in the Sandpiper (Bakken fracked) crude oil pipeline application and permitting process led and facilitated by Minnesota Department of Commerce (DOC) before the Minnesota Public Utilities Commission (PUC). Later in 2014, when the PUC approved the Certificate of Need (CN) for Enbridge's Sandpiper (Bakken crude) pipeline project, without an Environmental Impact Statement (EIS), environmental intervenors appealed the PUC's decisions. The Minnesota Court of Appeals *reversed and remanded* because

> [w]hen certificate of need proceedings precede routing permit proceedings for a large oil pipeline, the Minnesota Environmental Policy Act requires that an environmental impact statement be completed before a final decision is made on the certificate of need.

See *In re N.D. Pipeline Co.*, 869 N.W.2d 693 (Minn. App. Sept. 14, 2015) (Public Utilities Commission File No. PL-6668/CN-13-473, PL-6668/PPL-13-474).

On August 4, 2015, Enbridge abandoned the Sandpiper Pipeline Project, a proposed 612-mile, $2.6 billion oil pipeline that would transport light crude oil from the Bakken Shale and Western Canada to Wisconsin. Not long after Enbridge bought into Dakota Access Pipeline (DAPL), on September 3, 2016, during Labor Day weekend, the Dakota Access Pipeline brought in a private security firm when the company used bulldozers to dig up part of the pipeline route that contained possible burial sites and culturally significant artifacts; it was subject to a pending injunction motion [and] construction workers bulldozed a section of privately owned land the tribe had claimed as sacred ground, and when protesters trespassed into the area security workers used attack dogs which bit at least six of the protesters and one horse. (See Dakota Access Pipeline protests - Wikipedia "*Standing Rock Special: Unlicensed #DAPL Guards Attacked Water Protectors with Dogs & Pepper Spray*". Democracy Now!. Archived from the original on June 13, 2019. Retrieved June 19, 2019. Standing Rock Special: Unlicensed #DAPL Guards Attacked Water Protectors with Dogs & Pepper Spray | Democracy Now! Enbridge and the PUC filed an unsuccessful petition for review to the Minnesota Supreme Court for *In re N.D. Pipeline Co.*, 869 N.W.2d 693 (Minn. App. Sept. 14, 2015), which review was denied (Minn. Dec. 15, 2015) (A15-0016).

[33] In January 2016, the White Earth Band intervened and joined other Ojibwe (Chippewa) Anishinabe tribal governments and environmental intervenor groups (like Honor the Earth based

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 15.

2.  As part of Line 3 comments process, Monica Hedstrom, Director of Natural Resources for the White Earth Band did file Line 3 comments[34] on 5-17-2019 with the Minnesota DNR to inform them that

> As part of the Line 3 environmental review process the White Earth Band of Ojibwe helped develop and has adopted the Minnesota Chippewa Tribe's Anishinabe Cumulative Impacts Assessment as the White Earth Band's environmental risk and evaluation tool for the meaningful assessment of the short and long term impact of the abandonment of the existing Line 3 pipeline, as well as the impacts from tar sands extraction, greenhouse gases, climate change and additional, future pipeline abandonment from the decreased demand for crude oil. The White Earth Band of Ojibwe did FIND that the Minnesota Chippewa Tribe's Anishinabe Cumulative Impacts Assessment is superior to the EIS that has been approved by the Minnesota PUC in examining the cumulative impacts from the proposed Line 3 project upon surface waters, groundwater, fish, wildlife, waterfowl, wild rice, plants, as well as the broader environmental consequences resulting from the proposed Line 3 project, which necessarily requires prohibiting the Line 3 Pipeline Replacement, new route corridor for the replacement pipeline across the 1855 ceded territory in violation of White Earth Band of Ojibwe and 1855 Treaty Authority established codes, laws

on White Earth Reservation) in the Line 3 (tar sands) crude oil pipeline permitting process led and facilitated by Minnesota Department of Commerce (DOC) before the Minnesota Public Utilities Commission (PUC).  When the White Earth Band filed its motions to intervene in Line 3, the Deputy Commissioner of Minnesota Department of Natural Resources wrote Feb. 5, 2016, to Ms. Heydinger, Chair, Minnesota  Public Utilities Commission, Re: In re Application  of Enbridge  Energy, MPUC Docket No. PL-9/CN-14-916 saying in part that

> the DNR is, however, concerned about any ruling the Public Utilities Commission (PUC) might make regarding the Band's claim that it has usufructuary rights in the 1855 ceded territory in the context of addressing the Band's request to intervene in these proceedings.   A PUC decision to permit the Band to intervene in these proceeding premised on claimed usufructuary rights could have legal implications reaching well beyond these proceedings.  The DNR, therefore, requests that if the PUC permits the Band to intervene it do so using its discretionary authority without addressing the Band's claim that it has usufructuary rights in the 1855 ceded territory.

See copy of DNR letter attached as Exhibit B.

[34] See letter to DNR Comm. Strommen dated 5-17-2019 from Monica Hedstrom, Director of Natural Resources for the White Earth Band attached as Exhibit C.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 16.

and customs required ==consent as co-owners==[, concluding that ==further consultation will be necessary.  If you have any questions or need of further information about Rights of Manoomin and consent==, please call on me at 218-935-2488.

3.   White Earth and Red Lake filed comments with the Minnesota Pollution Control Agency (MPCA) with regard to the 401 Clean Water Act April 10, 2020, by letter to Commissioner Laura Bishop, Minnesota Pollution Control Agency, 520 Lafayette Road North St. Paul, Minnesota 55155-4194, Re: *Clean Water Act Section 401 Permitting for Enbridge Line 3 Project [and] Tribal Water Rights and Environmental Jurisdiction Comments*[35], requiring free, prior, informed consent from the Chippewas of the Mississippi and White Earth Band of Ojibwe.  The Administrative Law Judge (ALJ) for the contested case hearing dismissed tribal water rights arguments before the contested case proceeding was conducted because he *found* that tribal water rights are based on federal law and declared that

> 3. The Red Lake-White Earth Petition identifies two issues for a contested case hearing. The ==first issue== is: Whether the MPCA may apply the provisions of the Clean Water Act to impacted Indian tribes.
>
> 4. The MPCA finds that the first issue raises a question of law that is not appropriate for a contested case hearing. The petitioners allege that the Clean Water Act does not apply to Indian tribes, which is a question of statutory interpretation. As a result, the first issue does not satisfy the criteria for a contested case.
>
> 5. The ==second issue raised== in the Red Lake-White Earth Petition is: Whether Congress exempted waters rights from the 1953 jurisdictional grant under Public Law 280 to all states, including Minnesota, and, if so, whether the 401 Certification violates the water rights of Chippewa Tribes.

---

[35] See copy attached as ==Exhibit D.==

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 17.

6. The MPCA finds that the second issue raises a question of law that is not appropriate for a contested case hearing. The issue turns on questions of water rights under federal law, including Indian treaty rights. As a result, the second issue does not satisfy the criteria for a contested case.

See https://www.pca.state.mn.us/sites/default/files/Enbridge-Line-3-CCH-order.pdf MPCA ALJ Order dated 6-3-20.

See also comments submitted to the PUC by the 1855 Treaty Authority with regard to Sandpiper, Line 3 and decommissioned pipeline clean-up and removal.[36]

4. The Mn DNR did NOT hold a contested case proceeding with regard to 401 Clean Water Act 401 permits for Line 3. Instead the DNR took phone comments at virtual hearings during the Covid-19 pandemic and the DNR did state[37] *at item 11* that

> The Project would also cross wetlands and streams not covered by DNR licenses or permits. These wetland and stream crossings are regulated by the USCOE Clean Water Act section 404 permit and the MPCA Clean Water Act section 401 Water Quality Certification.

---

[36] See https://mn.gov/eera/web/project-file?legacyPath=/opt/documents/34079/Public%20Comments%201%20to%20A.pdf

[37] See https://files.dnr.state.mn.us/features/line3/decisions/cross-public-land-decision.pdf FINDINGS OF FACT, CONCLUSIONS AND ORDER by Barb Naramore, DNR Deputy Commissioner License for Utility to Cross State Lands No. ULND010332 Enbridge Line 3 Replacement Project 11-12-2020.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 18.



5. The DNR License for Utility to Cross State Lands No. ULND010332 Enbridge Line 3

Replacement Project responded to Tribal comments about public lands at section

**i. Comments Received from The 1855 Treaty Authority, the Red Cliff Band of Superior Chippewa, and Honor the Earth and DNR Response**

25. The 1855 Treaty Authority commented that the Project will cross state forests where Band members hunt, fish, trap and gather. ***DNR Response:*** The license would not prevent Band members from hunting, fishing, and gathering in areas crossed by the pipeline. Further, as described below, **the project would not cause pollution, impairment or destruction that would interfere with hunting, fishing or gathering.** Enbridge is required to comply with comprehensive restoration and revegetation requirements under the EPP, which are designed to restore impacts from construction.

(Id. at section i, item 25)(Emphasis added).

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 19.

6.  Both White Earth and Red Lake as federally recognized tribal governments and as long time intervenors to the Line 3 PUC permitting process sought a *Stay of Construction* pending appeals at the Minnesota Court of Appeals, so that intervening Tribes could exercise their appeal rights under Minnesota state law before construction.  Minnesota State Senator John Marty wrote a letter to the PUC dated Dec. 3, 2020 (for the Dec. 4 PUC hearing) pointing out that

> granting a stay of construction allows the PUC to acknowledge that others have valuable perspectives and should be allowed their day in court. To date, the perspectives of the Red Lake and White Earth Nations, who have rights to treaty lands through which this new corridor will run, have not been taken into account. In the Certificate of Need, the Commission omitted discussion of treaties from the order, determining that while the ALJ report considered them, the PUC did not need to [, citing] Footnote 18 of the September 2018 order states: "For example, the ALJ Report included a section discussing the treaties between the federal government and the Native American sovereign nations located in Minnesota. The Commission concludes that this discussion is not necessary to the Commission's decision, and therefore does not adopt these findings."

See copy of Sen. Marty letter attached as Exhibit E.  The PUC denied the stay.[38]

7.  The White Earth Band has participated in a variety of appeals in the Minnesota Courts of Appeals with other Tribes and environmental parties.  There remains presently an appeal about the 401 Clean Water Act (CWA) permit issued by the MPCA at the Minnesota Courts of Appeals.  Oral arguments were held and an order is most likely still 30 plus days away.

---

[38] See *Minnesota regulators decline to halt Line 3 construction, Utility commissioners vote down motion from tribal nations seeking to stop the pipeline project from proceeding*, by Matthew Guerry, Dec. 4, 2020, https://www.duluthnewstribune.com/news/government-and-politics/6787895-Minnesota-regulators-decline-to-halt-Line-3-construction

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 20.

8. The White Earth Band is party with Red Lake and environmental parties challenging the 404 CWA permits issued by the United States Army Corps of Engineers (USACE) in Federal District Court, D.C. Circuit, for not following the National Environmental Policy Act (NEPA) and not doing an EIS etc. Briefing just concluded. The same *Lorax question* is being asked about the USACE in Federal Court.

9. During the pendency of the EIS process by the PUC and the 401 CWA permitting by the MPCA and MDNR permitting, Enbridge's water appropriation need was approximately 510.5 million gallons for the entire Line 3 pipeline project.

10. On June 4, 2021, the MDNR issued Water Appropriation Permit No. 2018-3420 Enbridge Line 3 Replacement Project, dated June 4, 2021. The order[39] first states

> Pursuant to the requirements of Minn. Stat. § 103G.271, Enbridge applied for and was issued four separate water appropriation permits as part of its proposed Line 3 Replacement Pipeline Project ("Project"). The permits issued seek to appropriate water for (1) hydrostatic testing and horizontal directional drilling, (2) trench and construction dewatering, (3) dust suppression, and (4) construction dewatering near the Gully 30 calcareous fen. These Findings of Fact only address Enbridge's water appropriation permit amendment for trench and construction dewatering ("Amendment"). The other three water appropriation applications and initial construction dewatering application were addressed in separate findings and have been issued permits.

11. DNR Water Appropriation Permit No. 2018-3420 does not follow Gov. Walz Executive Order 19-24 and does *not* included affected Tribes as eligible to file a *demand a hearing* and instead only allows

---

[39] See https://files.dnr.state.mn.us/features/line3/decisions/04june2021-update-trench-watering-decisions.pdf Water Appropriation Permit No. 2018-3420 Enbridge Line 3 Replacement Project, dated June 4, 2021.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 21.

the applicable municipality, watershed district or soil and water conservation district may file a demand for a hearing on the Amendment in accordance with Minnesota Statute § 103G.311, subd. 5 and Minnesota Rule 6115.0670, subp. 3, within 30 days after mailing or electronic transmission of notice of this Order."

12. During a June 22, 2021 Tribal Executive Committee (TEC) meeting of the Minnesota Chippewa Tribe, MCT members requested that the TEC attempt to seek rescission of the 5 billion gallons of water appropriation[40] for Line 3 until actual consultation occurred under Gov. Walz Executive Order 19-24.

13. The DNR declined to rescind the new 5 billion gallons of water permit at the meeting and subsequently on July 14th the White Earth Tribal government and citizens traveled to the Minnesota State Capitol supported by Line 3 Water Protectors to call on Biden and Walz to rescind 5B water and pipeline permits.  Tribal members and water protectors urged President Joe Biden and Gov. Tim Walz to listen to Indigenous nations in northern Minnesota who are opposed to the pipeline, which would cross near reservation land and through waterways.[41]

14. Because of drought and frac-outs[42] from drilling under the headwaters of the Mississippi River[43], the White Earth Band served on Enbridge[44] a cease and desist

---

[40] See TEC Pres. Chavers letter to Gov. Walz dated 6-22-2021 regarding wild rice and drought attached as Exhibit F.

[41] See Line 3 protesters call on Biden, Walz to rescind pipeline permits By: Sarah Mearhoff, Jul. 15, 2021, https://www.grandforksherald.com/news/government-and-politics/7112669-Line-3-protesters-call-on-Biden-Walz-to-rescind-pipeline-permits)

[42] See https://www.youtube.com/watch?v=udQ2jGpqwZk *Line3 Project - Mississippi River Headwaters Sampling* 7/28/21. Video by Lucas Mulliken regarding the suspicious conditions at the Mississippi River near the Enbridge Line 3 Horizontal Directional Drilling site in the Headwaters. Clearwater County, Minnesota.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 22.

order for 48 hours from the White Earth Band to hold healing ceremonies for the Mississippi river and all the animal and plant inhabitants that rely on the clean water.

15. This action seeks declaratory and injunctive relief with regard to *exclusive water rights* of the *Chippewas of the Mississippi* as provided by White Earth Band of Ojibwe Res. 001-21-056, requiring free, prior, informed consent under express and Treaty-guaranteed water property rights, reserved water rights, priority, first-in-time and riparian rights and based on the *Winter's Doctrine* ground and surface water rights necessary to sustain *Manoomin*, the animals and plants of the upper Mississippi watershed for the people and culture of the sovereign, pan Chippewa Nation,

---

[43] See https://www.youtube.com/watch?app=desktop&v=fzT4cQYuZ7s  *Breaking at the Willow River Enbridge drilling construction operations hits an aquifer*, July 6 2021, Video by Keri Pickett/Honor the Earth, Breaking at the Willow River: Enbridge drilling construction operations hit an aquifer. What you see is drilling mud. The yellow booms are to stop it from flowing downstream. It is called a frack out.
[44] See https://www.youtube.com/watch?v=XxywMbxp3q8 Lakeland Public TV News

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 23.



expressed and retained throughout 44 treaties including the 1825, 1826, 1837, 1842, 1854 and 1855 Treaties with the United States government.  May the Chippewa have a mighty flood of justice, an endless river of righteousness like an ever-flowing stream and such other relief the Court deems just and proper.

### *Jurisdiction*

16. Jurisdiction is invoked under the White Earth Reservation Business Committee, White Earth Band of Chippewa Indians Resolutions Resolution Nos. 057-10-008 the *Ceded Territory Conservation Code of the 1855 Treaty Tribes*, 001-19-009 *Rights of Manoomin* Ordinance, 001-19-010 *Rights of Manoomin Code*, 019-21-002 adopting *Off Reservation ceded territory jurisdiction* and adoption of 1855 Treaty Authority

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 24.

Resolution 2018-01 for the *Right to Travel, Use and Occupy Traditional Lands and Waters Code* and the 1855 Treaty Authority Resolution 2018-05 for the *Rights of Manoomin Code*, as part of the laws of the White Earth Band of Ojibwe and the Chippewa's *Winter's Doctrine* for necessary quality and quantity of surface and groundwater to support the primary treaty foods of Manoomin (wild rice), fish and maple which all require abundant, clean freshwater.

17. Jurisdiction is also invoked under the American Indian Religious Freedom Act (AIRFA) (wherever wild rice or *Manoomin* exists), 42 U.S.C. § 1996; Public Law 83-280 (18 U.S.C. § 1162(b), 28 U.S.C. § 1360(b & c)),   42 U.S.C. § 1983 and 42 U.S.C. § 1988 for deprivation of federal and treaty civil rights and federal statutes protections by the DNR with the exercise of  federally protected, treaty-recognized water property rights, and defense of, necessary to support the inherent and usufructuary property rights to hunt, fish and gather under the 1855 Treaty (10 Stat. 1105); the 1825 Treaty (7 Stat. 272) and the 1826 Treaty (7 Stat. 290); the First Amendment; Fourth Amendment; Fifth Amendment; Due Process Clause; and, Equal Protection Clause of the Fourteenth Amendment.

## *Venue*

18. Venue is proper  pursuant to White Earth Band of Chippewa Indians Judicial Code, Title 1, Courts, Ch. II Jurisdiction, section 1(j) which provides that

> The Court shall have jurisdiction to hear all actions arising under any code, resolution or ordinance enacted to protect, preserve, or regulate the rights reserved for Chippewa people in treaties negotiated with the United States government regarding off-reservation resources. The Court shall also have

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 25.

jurisdiction to hear all actions arising under any code, resolution or ordinance enacted to conserve, manage, or protect the resources utilized by the Chippewa people, regardless of whether such code, resolution or ordinance contemplates conservation, management or protection within or without the boundaries of the Reservation.

(See https://whiteearth.com/assets/files/judicial/codes/judicial.code.pdf);

19. Foundation for jurisdiction and venue are also supported by WERBC Resolution Nos. 057-10-008 the *Ceded Territory Conservation Code of the 1855 Treaty Tribes*; 001-19-009 *Rights of Manoomin Ordinance*; 001-19-010 *Rights of Manoomin Code*; and 019-21-002 adopting *Off Reservation ceded territory jurisdiction*, including 1855 *Rights of Manoomin* and 1855 *Rights to Travel, Use and Occupy Traditional Lands and Waters code*.

### Parties

20. MANOOMIN, or wild rice, possesses inherent rights to exist, flourish, regenerate, and evolve, as well as inherent rights to restoration, recovery, and preservation. These rights include, but are not limited to, the right to pure water and freshwater habitat; the right to a healthy climate system and a natural environment free from human-caused global warming impacts and emissions. Manoomin is considered by the Anishinaabe people to be a gift from the Creator or Great Spirit and continues to be an important staple in the diets of native peoples for generations, is a central element of the language, culture, heritage, migration stories and history of the Anishinaabe people, and is an integral part of the wetland ecosystems and natural communities of

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 26.

our traditional lands and waters.  Manoomin is also an indicator[45] species in the ecosystem also struggling to survive climate change.

21. WHITE EARTH BAND OF OJIBWE (or White Earth Reservation Business Committee) (WERBC) the White Earth Reservation Business Committee is the duly elected governing body of the White Earth Reservation pursuant to Article VI, Section 1, of the revised constitution of the Minnesota Chippewa Tribe, as amended, and organized under Section 16, of the Act of June 18, 1934 (48 Stat. 984), ) and therefore has the responsibility and authority to provide for the safety, health and welfare of its tribal members on and off reservation. https://whiteearth.com/home?p=1

22. MICHAEL FAIRBANKS, is the duly elected Chairman of the White Earth Band and is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the

---

[45] See https://www.wpr.org/indicator-plant-wild-rice-struggles-survive-changing-climate; Manoomin, A Cultural And Nutritional Staple For Thousands Of Years, Faces Wide Range Of Threats, By Mary Kate McCoy Wisconsin Public Radio, March 2, 2020. Manoomin, or wild rice, has been a spiritual, cultural and culinary staple for Wisconsin tribes for thousands of years. But experts estimate it's lost nearly half of its historic range and say climate change is likely the greatest threat it's ever faced. Those who work with manoomin know how sensitive the native, annual plant is, and warn it's an indicator species of climate change. In this series, WPR is exploring how the state can adapt to and mitigate the affect climate change is having on some of Wisconsin's most iconic foods.
See also https://data.glifwc.org/manoomin/pdf/Manoomin.Stewardship.Plan.draft.[2019-08-15].pdf
See also *U.S. Army Corps of Engineers Upper Mississippi River Headwaters Bemidji to St. Paul, Final Integrated Reservoir Operating Plan Evaluation and Environmental Impact Statement 2009* at  https://www.bestofdocument.com/pdf/upper-mississippi-river-headwaters-bemidji-to-st-paul-integrated-reservoir-operating-plan-evaluation/ The responsible lead agency is the U.S. Army Corps of Engineers; the St. Paul District has the lead in preparation of this Integrated Reservoir Operating Plan Evaluation and Environmental Impact Statement. The U.S. Forest Service is a cooperating agency.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 27.

various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and is responsible for the health, safety and welfare of tribal members and defending the Manoomin, the waters, and Chippewa treaty rights.

23. LEONARD 'ALAN' ROY is the duly elected Secretary-Treasurer of the White Earth Band and is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and is responsible for the health, safety and welfare of tribal members and defending the Manoomin, the waters, and Chippewa treaty rights.

24. RAYMOND AUGINAUSH is the duly elected District 1 Representative of the White Earth Band and is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and is responsible for the health, safety and welfare of tribal members and defending the Manoomin, the waters, and Chippewa treaty rights.

25. KATHY GOODWIN is the duly elected District 2 Representative of the White Earth Band and is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 28.

the United States government, and is responsible for the health, safety and welfare of tribal members and defending the Manoomin, the waters, and Chippewa treaty rights.

26. CHERYL 'ANNIE' JACKSON is the duly elected District 3 Representative of the White Earth Band and is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and is responsible for the health, safety and welfare of tribal members and defending the Manoomin, the waters, and Chippewa treaty rights.

27. TODD JEREMY THOMPSON is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

28. DAWN GOODWIN is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 29.

29. NANCY BEAULIEU is an adult person and member of Minnesota Chippewa Tribe, enrolled with the Leech Lake Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

30. WINONA LADUKE is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.  LaDuke was designated *Guardian of the Shell River*[46] at the July 9, 2019, meeting of the 1855 Treaty Authority.  LADUKE is also executive director of Honor the Earth.

31. PATRICIA "ALEX GOLDEN-WOLF" OSUNA is an adult person and member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

---

[46] See *Women of the Shell River*, 7-15-2021 https://www.youtube.com/watch?v=nIK25Z2qSaA

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 30.

32. JUSTIN KEEZER is an adult person and member of Minnesota Chippewa Tribe, enrolled with the Leech Lake Band, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

33. TANIA AUBID is an adult person and member of Minnesota Chippewa Tribe, enrolled with the Mille Lacs Band of Ojibwe, and is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.[47]

34. SIMONE SENOGLES is an adult person and member of Red Lake Band of Chippewa Indians (https://www.redlakenation.org/), and is a beneficiary of the signatories of the various 44 Chippewa treaties, including but not limited to the 1825, 1837, 1863 and 1854 Treaties with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

35. GINA (PELTIER) EELE is an adult person and member of Turtle Mountain Band of Chippewa Indians (https://tmchippewa.com/), and is a beneficiary of the signatories of

---

[47] See *Tania Aubid Water Protector* https://www.youtube.com/watch?v=k472LVjq7TE

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 31.

the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

36. TARA WIDNER is an adult person and whose mother was an enrolled member of Minnesota Chippewa Tribe, enrolled with the White Earth Band, and would be considered a Descendant on reservation, but off-reservation is a beneficiary of *Chippewas of the Mississippi* signatories of the various 44 Chippewa treaties, including but not limited to the 1855 Treaty with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights.

37. TARA HOUSKA is an adult person and citizen of Couchiching First Nation, and is a beneficiary of the various Chippewa treaties, including but not limited to the 1825 and 1826 Treaties with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Chippewa treaty rights. Tara Houska is an environmental and Indigenous rights attorney and advocate, land defender, founder of the Giniw Collective, and a leader of the efforts to stop Line 3.

38. JAMIE "JAIKE SPOTTED-WOLF" WORTHINGTON is an adult person and citizen of Mandan, Hidatsa and Arikara Nation, also known as the Three Affiliated Tribes https://www.mhanation.com/ and Fort Peck Assiniboine & Sioux Tribes Fort Peck

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 32.

Assiniboine & Sioux Tribes (fortpecktribes.org) , and is a beneficiary of the *1825 Treaty with the Sioux and Chippewa, Sacs and Fox, Menominie, Ioway, Sioux, Winnebago, and a portion of the Ottawa, Chippewa, and Potawattomie, Tribes[48]* with the United States government, and has been charged with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Sioux and Chippewa treaty rights.

39. SHANAI MATTESON is an adult person and non-Indian citizen resident of Minnesota, is an invited guest by the Chippewa to our public properties, land and water, has been charged with Trespass based state laws, along with many other similarly situated non-Indians, by the State of Minnesota for participation in defending the Manoomin, the waters, knowing DNR actions are contrary to Chippewa treaty rights.

40. ALLEN RICHARDSON is an adult person and citizen of citizen resident of Minnesota, is an invited guest by the Chippewa to our public properties, land and water, has been charged with Trespass based on state laws, along with many other similarly situated non-Indians, by the State of Minnesota for participation in defending the Manoomin, the waters, knowing DNR actions are contrary to Chippewa treaty rights.

41. THE MINNESOTA DEPARTMENT OF NATURAL RESOURCES (DNR) is an administrative subdivision of the state of Minnesota, responsible for managing

---

[48] See http://ioway.nativeweb.org/history/treaty1825.htm

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 33.

Minnesota's natural resources according to the Constitution and the law. DNR is the agency which is charging and arresting Chippewa Tribal members with Trespass by the State of Minnesota for participation in defending the Manoomin, the waters, and Sioux and Chippewa treaty rights. https://www.dnr.state.mn.us/

42. SARAH STROMMEN is the Commissioner of the DNR with the responsibility of managing only those resources over which she has lawful authority, by promulgating and enforcing DNR regulations through the employees and resources of the DNR, which does not include federally guaranteed, Treaty-recognized usufructuary property that is reserved to the Chippewa people. She is named in her official and her individual capacity and acted under color of law and in disregard of the federal treaty and civil legal rights of Chippewa Water Protectors.

43. RANDALL DODEEN is the Ecological and Water Resources, Conservation Assistance and Regulation Section Manager, who issued the *Findings of Fact, Conclusions and Order of Commissioner* for the *Amendment to Water Appropriation Permit 2018-3420* on June 4, 2021. He is named in his official and his individual capacity and acted under color of law[49] and in disregard of the federal treaty and civil legal rights of Chippewa Water Protectors.

44. BARB NARAMORE, DNR Deputy Commissioner issued the *License for Utility to Cross State Lands No. ULND010332 Enbridge Line 3 Replacement Project* 11-12-

---

[49] See https://files.dnr.state.mn.us/features/line3/decisions/04june2021-update-trench-watering-decisions.pdf Water Appropriation Permit No. 2018-3420 Enbridge Line 3 Replacement Project, dated June 4, 2021.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 34.

2020. She is named in her official and her individual capacity and acted under color of law and in disregard of the federal treaty and civil legal rights of Chippewa Water Protectors. (See *DNR State Lands for Line 3 map* at item 11, on page 18 *supra*).

45. DNR *Conservation Officers* named JOHN and JANE DOEs are named in their official and individual capacities and acted under color of law and in disregard of the federal legal rights of Chippewa and other Water Protectors.

### *The Incidents Giving Rise to the Complaint*

46. According to *Findings of Fact, Conclusions and Order of Commissioner* for the *Amendment to Water Appropriation Permit 2018-3420* on June 4, 2021, the permit amendment for Line 3 relates solely to the appropriation of water for construction dewatering of the pipeline corridor. Enbridge was issued permit no. 2018-3420 on December 8, 2020 for a total of 510.5 million gallons of water and requested an increase of that volume through this amendment for a total volume of 4,982,768,568 (5 Billion) gallons. A multitude of other permits and regulatory requirements will also apply to the Project prior to and during construction. Enbridge has completed 185.6 miles of installation out of the 330 miles total in Minnesota (56%), and has completed 136 waterbody crossings out of the total 227 waterbody crossings (60%). According to the amendment request memo from May 12, 2021, as of June 1, 2021 Enbridge will have appropriated 479,173,822 million gallons through trench dewatering.

47. Enbridge submitted a permit amendment request on January 26, 2021. Enbridge submitted a $150 check covering the amendment permitting fee in accordance with

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 35.

the administrative rule for permit amendments. On May 12, 2021, Enbridge submitted a revised Amendment request based on comments received from MPCA and DNR staff during the Request for Comments Period described below. DNR's decision on Water Appropriation Amendment Permit No. 2018-3420 (the "Permit") is based on the May 12, 2021 revised submittal.

48. On May 14, 2021 Randall Dodeen contacted Monica Hedstrom, WE Natural Resources Director for a May 27, 2021, by email for a tribal participation meeting scheduled for May 27, 2021.  Renee Keezer, Pesticides Coordinator for WE Natural Resources participated in the one-time meeting.  See *Water Report "What happens when the water goes down?"* by Renee Keezer dated attached as Exhibit A.

49. On June 22, 2021, the TEC sent a letter to Governor Walz to rescind the Amended Water Appropriation until government-to-government consultation as provided under E.O. 19-24 had occurred.  Minnesota DNR Commissioner declined the TEC request.

50. The stream flow of the Mississippi River coming off Blandin dam in Grand Rapids is very low and at least 3 feet below water marks of the river at the dam.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 36.



51. The stream flow downstream is insufficient to hold back tributaries of the upper Mississippi to support Manoomin (wild rice) habitats over many miles of rivers and lakes where Chippewa Treaty beneficiaries harvest Manoomin.  Water levels have dropped during this extreme drought period impacting the growth, harvest and reseeding of Manoomin.

52. The Minnesota DNR knew in December 2020, that this permit request to amend the 500 Million gallons permit to 5 Billion had submitted by Enbridge. The Minnesota DNR did not notify the natural resource directors of tribes, NOR Tribal leaders EVER

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 37.

officially, about this permit until May 14, 2021, by email. See *Water Report "What happens when the water goes down?"* Exhibit A.

53. When Renee Keezer checked back with Dodeen at DNR on June 9 for status on the permit, DNR informed her it was issued the week before.  (See Email exchanges DNR and Keezer May 27, 2021 to June 9, 2021 attached as Exhibits G and H).

54. Here, Minnesota Governor Walz's Executive Order 19-24 explains that

> Meaningful and timely consultation between the State of Minnesota and the Minnesota Tribal Nations will facilitate better understanding and informed decision making by allowing for collaboration on matters of mutual interest and help to establish mutually respectful and beneficial relationships between the State and Minnesota Tribal Nations.

See https://mn.gov/governor/assets/2019_04_04_EO_19-24_tcm1055-378654.pdf

55. The DNR planned to avoid meaningful and timely consultation with the tribes waiting for five (5) months until May 27, and acted unilaterally on June 4, 2021, and issued the permit for 5 billion gallons, ten times the original permit. The tribes had no time to evaluate the impact of these withdrawals on the watersheds and wild rice. It also appears DNR was intentionally authorizing extraction of good, clean ground water to avoid other dewatering and cross-contamination issues.  This is not meaningful and sufficient notification, especially when notification was avoided for months and not given directly to Tribal leaders.

56. Plaintiffs' usufructuary property rights to gather wild rice and other aquatic plants from the public waters in the 1855, 1854 and 1837 Treaty Territories, as well as other usufructuary property rights, are capable of repeated deprivation, by Defendants

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 38.

public declarations of the intent to do so, at least with respect to the 1855 Treaty Territory and the unilateral 5 billion gallon appropriation by DNR.

57. These violations by Defendants are capable of repetition and misappropriation has not been stopped.

**Claim I**
**Federal-Treaty Rights Supremacy v. State Regulation**
**(Minnesota Department of Natural Resources)**

58. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

59. The claims of Defendants to ownership[50] of wild rice (Manoomin), wild plants and animals in the public waters and on the public lands of the 1855, 1854 and 1837 Treaty Territories, with respect to members of the Minnesota Chippewa Tribe, are contrary to the federal Treaty-recognized usufructuary property rights to hunt, fish and gather those wild plants and animals for their own subsistence.

60. Under color of law, Defendants statutory claims to ownership of public waters, wild rice, wild plants and animals vis-à-vis beneficiaries of the 1855 Treaty, the 1825 and 1826 Treaties with the United State government violate federal statutes 10 Stat.1165, Apr. 7 1855; 7 Stat. 272, Aug. 19, 1825; and, 7 Stat. 290 , Aug. 5, 1826, on their face.

61. Defendants state statutory ownership claims are in direct contravention to the federal Treaty-recognized usufructuary property interests established in the Chippewa Treaties, ratified by the Senate, and memorialized in the Federal Code with respect to

---

[50] See https://www.revisor.mn.gov/statutes/cite/84.091

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 39.

the 1855 Treaty Territory as interpreted by *Minnesota v. Milles Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999).

## Claim II
### Due Process-Usufructuary Property Takings in the 1855 Treaty Territory
### (Minnesota Department of Natural Resources and Commissioner Landwehr)

62. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

63. The claims of Defendants to ownership of wild plants and animals in the public waters and on the public lands of the 1855 Treaty Territory, under color of law, are contrary to the federal 1855 Treaty-recognized usufructuary property rights to hunt, fish and gather those wild plants and animals for their own subsistence, memorialized in the Federal Code. Treaty with the Chippewa, Feb. 22, 1855, 10 Stat., 1165, Ratified Mar. 3, 1855, Proclaimed Apr. 7, 1855. Art. 2.

64. Defendants state statutory claims to ownership of wild plants and animals vis-à-vis beneficiaries of the 1855 Treaty, the 1826 and 1825 Treaties with the United States has resulted in game, fish, wild ricing and other regulations that have prevented, and are preventing the exercise of Plaintiffs various Treaty-recognized usufructuary property rights in the 1855 Treaty Territory.

65. Under color of law, Defendants enforcement of above state regulations constitute a taking of federal treaty-recognized usufructuary property without Due Process or just compensation, in violation of the Fourteenth Amendment of the Constitution of the United States.

## Claim III
### Equal Protection vis-à-vis 1837 and 1854 Treaty Beneficiaries

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 40.

**(Minnesota Department of Natural Resources and Commissioner Landwehr)**

66. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

67. Defendants have acknowledged the validity of the treaty-recognized usufructuary property rights in the 1837 Treaty Territory, and 1854 Treaty Territory[51], which the Minnesota DNR is obligated to recognize since 1999, 1993 and 1988 respectively.

68. The holding in *Minnesota v. Milles Lacs,* as clearly stated by Justice O'Connor made plain these usufructuary rights had not been abrogated by the 1855 Treaty. *Minnesota v. Mille Lacs Band,* at 195-96.

69. Defendants refused to apply the same standard to the application to 1855 Treaty Territory, to the detriment of thousands of members of the Minnesota Chippewa Tribe in the 1855 Treaty Territory.

70. In so doing, Defendants violated Plaintiffs' rights to equal protection of the laws under the Fourteenth Amendment to the Constitution of the United States, compared to members of Chippewa Bands located in the 1854 and 1837 Treaty Territories without rational basis and results in civil rights deprivations by Defendants.

**Claim IV**
**Fourth Amendment and Due Process Violations**
**(Minnesota Department of Natural Resources, Commissioner Strommen**
**and assistant Commissioners Dodeen and Naramore)**

71. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

72. Plaintiffs water, 5 billion gallons of water, as property has been seized without proper Notice and Opportunity to be heard damaging federally Treaty-recognized

---

[51] https://www.revisor.mn.gov/statutes/2019/cite/97A.157/pdf

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 41.

usufructuary property rights on public lands and waters within the 1855 Treaty Territory and, as such, were seized and unjustly taken from the Manoomin, the ecosystems, lakes, rivers and aquifers.

73. After the water as seized by DNR officials to give to Enbridge Line 3, Plaintiffs explained the direct interference with lawfully were exercising Treaty-recognized usufructuary rights to hunt, fish and gather but were cited and nonetheless, which will resulted in pecuniary loss, present and future damages for manoomin harvesters.

74. In so doing, Defendants violated Plaintiffs Fourth Amendment rights to be free from arbitrary and capricious seizure of 5 billion gallons of water and to be free from seizure of the tribal and personal water property rights, as part of federal Treaty-recognized usufructuary property rights. (PL 280 (b), 18 U.S.C. § 1162(b) and 28 U.S.C. § 1360 (b&c)) and 44 Chippewa Treaties with the United States.

### Claim V
### First Amendment Religious and Cultural Practices
### (Minnesota Department of Natural Resources, Commissioner Strommen and assistant Commissioners Dodeen and Naramore)

75. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

76. Plaintiffs religious and cultural practices in the 1855 Treaty Ceded Territory and beyond are subject to the American Indian Religious Freedom Act (AIRFA), 42 U.S.C. § 1996 and, as such, are protected by the First Amendment to the Constitution of the United States.

77. To the extent that unlawful Minnesota limitations of usufructuary property rights of the Chippewa people to fully engage in hunting, fishing and gathering to support their

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 42.

religious, ceremonial and cultural activities, state of Minnesota hunting, fishing and gathering regulations in the 1855 Treaty Ceded Territory violate the First Amendment protections of Plaintiffs, guaranteed by the First Amendment and American Indian Religious Freedom Act (AIRA).

**Claim VI**
**Failure to Train**
**(Minnesota Department of Natural Resources, Commissioner Strommen**
**and Assistant Commissioners Dodeen and Naramore)**

78. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

79. Defendants Minnesota DNR and DNR Commissioner Strommen and other DNR Conservation Officers defendants, acting under color of law, failed to provide adequate information and training to DNR staff, including Defendants Assistant Commissioners Dodeen and Naramore, in the lawful status of federal Treaty-recognized Chippewa usufructuary property rights in the 1855 Treaty Territory, to avoid unlawful enforcement of DNR regulations on tribal members.

80. The DNR was on notice, no later than the *Minnesota v. Milles Lacs* opinion in 1999, that all U.S. Chippewa Treaties in Minnesota retained Treaty-recognized usufructuary property rights to hunt, fish and gather in all public waters and lands in all of Minnesota, north of the 1825 Treaty boundary with the Lakota people.

81. DNR Commissioner Strommen is on NOTICE about Off-reservation tribal court jurisdiction and Rights of Manoomin by letter to the 1855 Treaty Authority stating

> Thank you for your correspondence dated June 1, 2021 (White Earth off reservation tribal court And Chippewa treaty protected uses of public lands) and June 7, 2021 (Protection of wild rice, wild rice waters

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 43.

of the Chippewas' of the Mississippi; Shell River and Rights of Manoomin). We appreciate the interest of the 1855 Treaty Authority in the issues raised in your letters.

See DNR Comm. Strommen letter dated 7-6-21 to Frank Bibeau, Executive Director of

1855 Treaty Authority attached as Exhibit I.

### Claim VII
### Violations of Rights of Manoomin
### (Minnesota Department of Natural Resources, Commissioner Strommen
### and Assistant Commissioners Dodeen and Naramore)

82. Plaintiffs re-allege preceding paragraphs as if fully alleged again, here.

83. Defendants Minnesota DNR and DNR Commissioner Strommen and other DNR defendants (named or John Doe conservation officers), acting under color of law, are impermissibly interfering with the rights of tribal members to maintain their spiritual relationship with manoomin, free of DNR violating treaty recognized usufructuary and water property rights, giving away 5B gallons of surface and groundwater, without adequate and legal notice to affected tribes and members or consent.

84. The DNR was on notice, no later than the *Minnesota v. Milles Lacs* opinion in 1999, that all U.S.-Chippewa Treaties in Minnesota retained Treaty-recognized usufructuary property rights to hunt, fish and gather in all public waters and lands in all of Minnesota, north of the 1825 Treaty boundary with the Lakota people.

85. DNR Commissioner Strommen has acknowledged NOTICE about White Earth exercising Off-reservation tribal court jurisdiction and *Rights of Manoomin* by letter to the 1855 Treaty Authority responding

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 44.

Thank you for your correspondence dated June 1, 2021 (White Earth off reservation tribal court And Chippewa treaty protected uses of public lands) and June 7, 2021 (==Protection of wild rice, wild rice waters of the Chippewas' of the Mississippi==; Shell River and ==Rights of Manoomin==). We appreciate the interest of the 1855 Treaty Authority in the issues raised in your letters.

See DNR Comm. Strommen letter dated 7-6-21 to Frank Bibeau, Executive Director of

1855 Treaty Authority attached as ==Exhibit I.==

## Remedies

1. *Declaratory Relief that*

    a. *Manoomin*, or wild rice, within all the Chippewa ceded territories possesses inherent rights to exist, flourish, regenerate, and evolve, as well as inherent rights to restoration, recovery, and preservation.  These rights include, but are not limited to, the right to pure water and freshwater habitat; the right to a healthy climate system and a natural environment free from human-caused global warming impacts and emissions.

    b. Chippewa treaty beneficiaries, and in particular the *Chippewas of the Mississippi* have exclusive surface and groundwater rights under the *Winter's Doctrine* to the public waters and aquifers, which necessarily requires *free, prior, informed consent*[52] from the Chippewa before unilateral state permitting may be granted for commercial purposes.

---

[52] See also  https://www.un.org/development/desa/indigenouspeoples/declaration-on-the-rights-of-indigenous-peoples.html The *United Nations Declaration on the Rights of Indigenous Peoples* (UNDRIP) was adopted by the General Assembly on Thursday, 13 September 2007

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 45.

c.  The Chippewas possess the Creator-given right to harvest manoomin, and protect and save manoomin seeds, including protecting the waters necessary for Manoomin to flourish within the 1855 ceded territory and beyond.

d.  Chippewa tribal members possess both a collective and individual right of sovereignty, self-determination, and self-government, which shall not be infringed by other governments or business entities claiming the right to override our rights.  This shall include the right to enforce this law free of interference from corporations, other business entities, governments, or other public or private entities.  These rights pre-date treaties and a derived from the individually held, usufructuary property rights protected by U.S. Constitutional due process, as part of the supreme law of the land.

e.  Other Tribal members party to Treaties with the Chippewa, with or without the United States, (like Council of the Three Fires https://native-americans.com/council-of-three-fires-confederacy/), which pre-date the U.S. and other colonial countries occupation in North America.

86. *Injunctive Relief* to

a.  Effectively and immediately *rescind* all the DNR water appropriation permits issued for Line 3 in this case, for commercial purposes, and in particular, Water Appropriation Permit No. 2018-3420 Enbridge Line 3 Replacement Project, dated June 4, 2021.

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 46.

b. Establish Surface and Ground Water Property and Joint Permitting Agreements with the State of Minnesota for the 1855 Treaty Territory, to prevent any further unilateral, surface and ground water permitting by the state of Minnesota DNR.

Dated: August 4, 2021

\_\_\_/s/ Frank Bibeau_____
Frank Bibeau, Tribal Attorney
Joe Plumer, Tribal Attorney
For the Manoomin,
White Earth Band of Ojibwe,
*Chippewas of the Mississippi,*
Individual tribal members, non-
Indian Water protectors and the
1855 Treaty Authority

Manoomin *et al*, v. Mn/DNR Comm. Strommen *et al*
Complaint for Declaratory and Injunctive Relief
August 4, 2021 draft, page 47.

# EXHIBITS

# EXHIBIT A



# WHITE EARTH RESERVATION

CHAIRMAN Michael Fairbanks SECRETARY-TREASURER Leonard Alan Roy
DISTRICT I Raymond Auginaush, Sr. DISTRICT II Kathy Goodwin DISTRICT III Cheryl "Annie" Jackson

# Waters Report
## What Happens When the Water Goes Down?
## July 16, 2021

**TO:**      White Earth Reservation Business Committee;
Monica Hedstrom-Director of Natural Resources;
White Earth Band of Ojibwe

**FROM:**    *Keezer, Renee L., Pesticide Coordinator*
*White Earth Department of Natural Resources*
*B.S. Environmental Science: Environmental Health & Toxicology*
*Emphasis*
*B.A. Indigenous Studies*

**RE:**      **Minnesota Department of Natural Resources**
**Amended Water Appropriation Permit #2018-3420**
**5 billion gallons of water for Enbridge Line 3**
**Summary and Comments**

An email was sent out by Randall Doneen from the Department of Natural Resources on May 14, 2021, regarding a need to issue a new dewatering permit to Enbridge for the Line 3 construction project. The amount of the previous permit was 510.5 million gallons was going to be exceeded in June and Enbridge needed a new permit that allowed them to remove an additional 4,472 million gallons from groundwater sources (unconfined aquifers). That is an additional 4.5 billion gallons. We had a meeting on May 27, 2021, to discuss the new permit and any concerns that we might have.

I asked if this was an amendment to the permit or a new permit. Randall Doneen stated it was a new permit. The new dewatering permit was issued on June 4th, 2021. During that meeting, Randall Doneen told me and others on the call that we would meet again on June 7, 2021, to discuss our concerns. On May 28, 2021, Randall Doneen sent an email that they were going to give a decision on the permit by the end of the week of June 4th.The concerns Charlie Lippert from Mille Lacs voiced in the meeting on May 27th were disregarded by the MPCA even though they were legitimate concerns regarding the infiltration rates of the increased amounts of water they will be displacing.

The MPCA was given a 30-day comment period from March 11, 2021-April 10, 2021. The DNR was aware of the need for a new dewatering permit and had an adequate amount of time to engage with and consult the tribes, but they did not. We were given less than 30 days to submit comment from the time of notification to the time the permit was issued. It was three weeks from the first notification sent on May 14th to the issuance of the permit. The meeting with There was only eight days from the time we had a meeting to the time the permit was issued. This does not seem like an adequate comment period or consultation. I am not aware of the DNR policy or guidance is on the coordination and consultation with Minnesota Tribal Nations.

On June 25th, 2021, the White Earth Tribal Council, White Earth legal representation, and myself, attended a meeting with the DNR Commissioner Sarah Strommen and several other DNR employees including Randall Doneen. The DNR agreed that there was not adequate consultation or comment period given to the White Earth and other tribes. There were no efforts made to rectify the lack of consultation. A summary of the response given was that the DNR will try to do better in the future to consult the tribes.

When there is a rapid decrease of water, there are several significant ecological impacts. These impacts have been exacerbated by the current severe drought that we are in. More than half the State of Minnesota is in severe drought. Around 4% of the State is in extreme drought. Some of these areas are directly on the Line 3 pipeline route. These areas are in Red Lake County, Marshall County, Polk County, Beltrami County, Clearwater County, and Hubbard County (NOAA, 2021). With decreased water from lack of precipitation, evaporation, and transpiration, lakes and ponds are shallower leading to increased temperatures in water. This causes a decrease in the dissolved oxygen levels. Minnesota lakes and waterways are deoxygenating at a higher rate than the oceans (Jane, 2021). Deoxygenation causes an increase in fish and vegetation die-offs (DNR, Hot weather likely contributing to fish die-offs, 2021). The decomposition of the fish and plants and warmer water causes the amounts of bacteria that do not use oxygen to increase. These bacteria release methane, a greenhouse gas. The warmer temperatures of lakes and ponds leads to an increase in instances of algae blooms (eutrophication) (Marohn, 2021). Minnesota is currently seeing algae blooms

earlier this year compared to non-drought years. These algae blooms are toxic to people, pets, and wildlife and makes less lakes available for recreation use, thus negatively impacting our economy, environment, wildlife, and human health.

The dewatering during a drought brings concerns over loss of specific yield. Specific yield is the volume of water available in the sediment of the ground (Johnson, 1967). The infiltration rates are decreased due to days of the topsoil being hardened in the heat and sun. This decreased the ability of the water to infiltrate the soil. The amounts of water being pulled from the groundwater reserves will not be able to infiltrate at the rate it is pulled during a normal season. Much of the water removed during the dewatering will run-off into the surface waters. Without precipitation and infiltration, the spaces between the porous sediment may decrease and not be able to expand to allow water into the spaces when precipitation does occur.

Lowered surface waters and low amounts of precipitation, increases the concentration of contaminants such as pesticides from non-point sources even though the amount of pesticide use has not increased. Pesticide drift of runoff is the most common way pesticides enter waterways. Aquatic organisms including fish and their food sources, are at increased risk of exposure and contamination. (Program, 2021). Agricultural regions are irrigating their crops due to the drought. The chemicals that are running off into surface waters and groundwater recharge areas in higher than typical concentrations. This is due to the same volume of chemicals being used but less water to dilute it. Pesticide effectiveness is decreased during drought due to the absence of moisture in the soil. Plants are not able to absorb the pesticides without the water to help them grow. Microbial breakdown and hydrolysis is diminished during droughts. There is less biological degradation to convert the pesticides into less toxic analytes. Multiple applications of pesticides during drought can cause a buildup of concentration and contribute to increased environmental contamination.

Groundwater dewatering in Northern Minnesota decreases the amount of water that is available to plants, surface waters, and sensitive wetlands. Many of our lakes are recharged through springs from the groundwater as are numerous other surface waters such as rivers, streams, and creeks. In October 2020, MPR released a story about a water permit for a hog farm that would require 15 million gallons of water annually from groundwater sources (Gunderson, 2020). The permit was held up due to the need for a hydrologic assessment for possible negative impacts to a calcareous fen that was a few miles away. The DNR identified it as having "potentially significant resource impacts. The science behind the concerns of the impacts to the neighboring wetlands is sound. Why was this scientific approach not taken regarding the Line 3 dewatering permits? The amount of water siphoned from the unconfined aquifers for this project is over 300 times the amount requested for the hog farm. The DNR states that the

dewatering is not going to have any significant impacts to the wetlands that the pipeline is going through however, hydrological science has shown that the dewatering will have negative impacts. These impacts are observable in the rice lakes and other surface waters and wetlands in the region. The water levels in the Lower Rice Lake on the White Earth Reservation are so low that it will be difficult if not impossible to harvest wild rice year. The science has been ignored for this project. How will 15 million gallons impact a wetland that is within three miles of the farm, but 5 billion gallons will not impact wetlands that the water is being directly extracted from?

Q90 is a number that is a way to measure drought conditions based on stream flow. The value indicates that 90% of the time, stream flow has been greater than that value. In other words, the stream flow has only been that level or below 10% of the time. Once the stream flow levels are below the Q90 value, it is considered a protected low flow level in Minnesota and is used for suspending water appropriation permits (DNR, Measuring Hydrology, 2021). As of 07/11/2021, approximately 25% of the state is at minimum flows where the flows in the rivers and streams are below the annual Q90 protection levels. An additional approximate of 25% of the State of Minnesota is in low flows where the monthly Q75 exceedance levels have been matched (DNR, 2021). This is the worst drought in Minnesota in 127 years.

Despite the severe and extreme drought conditions, Enbridge is still pulling surface waters from the Mississippi River (surface water) at the Mississippi River Crossing #1 on Great River Road. Q90 has been reached yet Enbridge gets an exception to the rule for surface water and ground water permits. Trees in the region are showing signs of drought stress. It is mid-July and quaking aspens are losing their leaves. Fruit bearing plants such as blueberries are not producing this year due to the lack of water. The steady lowering of the water table from the dewatering and the drought has made ground water less accessible for trees and plants. This has impacts on the wildlife as well. Continuing to extract ground water and surface water has the potential to lead to significant losses of biodiversity in plants, animals, and fish and could lead to a potential collapse in various ecosystems throughout the region.

Other impacts that have not been discussed or addressed is the potential for widespread contamination in the event of a leak or spill. The regions where dewatering is necessary to construct the line leaves the entire region at risk of contamination. If the water table does return to normal after completion of the project, this pipeline will be completely submerged in the groundwater of the aquifers. A spill or leak would permanently impair the water. There is no feasible way to clean-up this type of contamination as is seen at the Pinewood crude oil spill research site near Bemidji, MN, where there is 17-22 inches of oil in the aquifer from a pipeline rupturing in 1979. It was one of the largest pipeline spills in Minnesota. There is no way to remediate the contamination. We are only able to monitor the underground movement of the oil. The

contamination and damage from a spill along the new route would be severely degrade the environment and to the quality of life of people that are dependent on the water for their wells. The Minnesota tourist economy would be negatively impacted as well.

The lack of science-based decision making in this permitting process is alarming but not as much as the complete disregard to the Traditional Ecological Knowledge (TEK) and Treaty Rights regarding the water and wild rice. These rights are not confined to the borders of the reservation, but to the borders of the ceded territory. The members of the Minnesota Chippewa Tribe retain rights to the resources including the water. Every aspect of Ojibwe history and life is tied to the water and rice. Spiritual, cultural, physical, and economic. It is a foundation of their identity as a Nation of people. For years, members of the Minnesota Chippewa Tribe have been stating the negative impacts that this project will have on the water and wild rice. The wild rice is the reason the Ojibwe migrated to this region hundreds of years ago. It is a part of the Ojibwe prophesies. To go to where the food grows on the water. The Ojibwe are here specifically to protect the water and wild rice.

The Minnesota Department of Natural Resources has shown that the science does matter with regards to management of the resources. Perhaps the DNR needs to be reminded that the State of Minnesota would not exist without the treaties and that the Treaties do not give the Ojibwe rights to the land and resources, those rights have always been retained as they are the inherent Sovereigns but grants rights to the non-indigenous people to occupy the land and utilize the resources. Article 6 of the United States constitution states "All Debts contracted and Engagements entered into, before the Adoption of this Constitution, shall be as valid against the United States under this Constitution, as under the Confederation. This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. The Senators and Representatives before mentioned, and the Members of the several State Legislatures, and all executive and judicial Officers, both of the United States and of the several States, shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.". Every elected official and police officer has sworn to uphold the constitution and in doing so, have sworn to uphold the treaties.

The blatant disregard to Tribes' rights and concerns, the hydrological science, and current environmental status with the drought and heatwaves due to the changing climate from petroleum use and extraction, shows that the economic influence of a foreign corporation takes precedence over the adequate protection and management of the environment.

## References

DNR, M. (2021, June 21). Hot weather likely contributing to fish die-offs. Retrieved from MN Department of Natural Resources: https://www.dnr.state.mn.us/news/2021/06/21/hot-weather-likely-contributing-fish-die-offs

DNR, M. (2021). Measuring Hydrology. Retrieved from MN Department of Natural Resources: https://www.dnr.state.mn.us/whaf/about/5-component/hydro_measure.html

DNR, M. (2021). Minnesota Weekly Stream Flow Report 07/11/2021. Retrieved from https://files.dnr.state.mn.us/waters/surfacewater_section/stream_hydro/2021data/sfr071121map.pdf

Gunderson, D. (2020, October 6). In western Minnesota water dispute, it's elite hogs vs. rare fen. Gary, Minnesota. Retrieved from https://www.mprnews.org/story/2020/10/06/in-western-minnesota-water-dispute-its-elite-hogs-vs-rare-fen

Jane, S. H. (2021). *Widespread deoxygenation of temperate lakes*. Nature (594), 66-70. DOI: https://doi.org/10.1038/s41586-021-03550-y

Johnson, A. (1967). *Specific yield: compilation of specific yields for various materials*. Water Supply Paper 1662-D. USGS Publications Warehouse. DOI: https://doi.org/10.3133/wsp1662D

Marohn, K. (2021, June 19). *Hot weather fuels early algae blooms on Minnesota Lakes.* Brainerd, MN. Retrieved from https://www.mprnews.org/story/2021/06/19/hot-weather-fuels-early-algae-blooms-on-minnesota-lakes

NOAA, N. I. (2021, 07 15). Drought.gov. Retrieved from Current Conditions for Minnesota: https://www.drought.gov/states/minnesota

Program, P. (2021). *Pesticide Advisory: Increased dangers of pesticide use during hot and dry weather conditions.* Oregon Department of Agriculture. Retrieved from https://www.oregon.gov/oda/programs/Pesticides/Documents/2021/DroughtAdvisory070621.pdf

# EXHIBIT B



## Minnesota Department of Natural Resources
500 Lafayette Road  Saint Paul, Minnesota  55155-4037
Office of the Commissioner
651-259-5555

MNDNR

February 5, 2016

Ms. Beverly Jones Heydinger
Chair
Minnesota Public Utilities Commission
121 7th Place East
Suite 350
St. Paul, MN 55101-2147

**Re:    In re Application of Enbridge Energy
        MPUC Docket No. PL-9/CN-14-916**

Dear Chair Heydinger:

I am writing regarding a recent petition made by the White Earth Band of Ojibwe (Band) to intervene in the above-captioned proceedings. The Petition was premised in part on a claim made by the Band that it has off reservation hunting, fishing and gathering rights (usufructuary rights) in the 1855 ceded territory.

The Minnesota Department of Natural Resources (DNR) is not a party in the above referenced proceeding and, in light of DNR's role in assisting in the preparation of environmental review documents for this proposed project, the DNR has opted not to intervene in these proceedings as a party. The DNR is, however, concerned about any ruling the Public Utilities Commission (PUC) might make regarding the Band's claim that it has usufructuary rights in the 1855 ceded territory in the context of addressing the Band's request to intervene in these proceedings. A PUC decision to permit the Band to intervene in these proceeding premised on claimed usufructuary rights could have legal implications reaching well beyond these proceedings. The DNR, therefore, requests that if the PUC permits the Band to intervene it

do so using its discretionary authority without addressing the Band's claim that it has usufructuary rights in the 1855 ceded territory.

Thank you in advance for your attention to this matter.

Sincerely,

Dave Schad
Deputy Commissioner
Minnesota Department of Natural Resources

cc:     Sherry Enzler, General Counsel
        Jamie Schrenzel, Environmental Review

23.0005 02-02-16 Ltr.HydingerreWEBand

# EXHIBIT C



# WHITE EARTH RESERVATION

**VICE CHAIR & DISTRICT III** Eugene "Umsy" Tibbetts **SECRETARY-TREASURER** Leonard Alan Roy
**DISTRICT I** Raymond Auginaush, Sr. **DISTRICT II** Kathy Goodwin

May 17, 2019

SENT VIA EMAIL TO:
commissioner.dnr@state.mn.us

Sarah Strommen, Commissioner
Minnesota Department of Natural Resources
Attn: Line 3 Pipeline Replacement Applications
500 Lafayette Road
St. Paul, MN 55155

Re:  **Comments on Enbridge Line 3 Replacement** environmental impacts to
Chippewa Treaty Protected Resources and Cultural Properties

Dear Commissioner Strommen,

Please find attached a copy of the January 25, 2019 letter from Chairman Terry Tibbetts
(with attachments) to Governor Walz regarding: Chippewas of the Mississippi *Rights of
Manoomin* and co-management to protect common, environmental resources.  The Chairman's
letter shows courtesy copies to yourself, Minnesota Pollution Control Agency Commissioner
Laura Bishop and Attorney General Keith Ellison.  The important message in the letter gives
notice that "we challenge the State of Minnesota's unilateral authority to grant Section 401
Clean Water Act permits for Enbridge's Line 3R pipeline activities, without our consent, and
request full hearing, with contested case proceedings, if Minnesota plans to exercise primary
jurisdiction."

Since that time Chairman Tibbetts passed on March 17, the DNR has provided a 60-day
comment period ending today, but the DNR has not acknowledged or responded to the
Chairman's letter.  The DNR website shows Enbridge is seeking Public Waters Work Permits as
part of the overall State of Minnesota 401 clean water act permitting process.  Websites show
that neither the DNR nor MPCA has accepted Enbridge's Line 3 applications as complete.  It
also appears MPCA will be doing a more thorough public process.

The White Earth Band of Ojibwe understands that the bulk of the waters of the United
States, the other party to the Chippewa treaties, have predominantly become public waters of
Minnesota, under Section 401 review of the Clean Water Act by the

DNR and MPCA and which Minnesota public waters are where most of the wild rice grows. Consequently the White Earth Band of Ojibwe cannot ignore that *Climate change affects lakes, walleye in complex ways*[1] and that years later an *Ojibwe leader says Mille Lacs walleye have not recovered yet*[2].  The White Earth Band of Ojibwe understands that any increase in tar sands extraction will only speed up climate change and compound environmental and aquatic problems in Minnesota, and when walleye fishing people can't fish Mille Lacs, they usually shift further north to Big Sandy, Pokegama, Big Winnie, Cass Lake and Leech Lake, which are all original 1855 reservations.

As part of the Line 3 environmental review process the White Earth Band of Ojibwe helped develop and has adopted the Minnesota Chippewa Tribe's Anishinabe Cumulative Impacts Assessment as the White Earth Band's environmental risk and evaluation tool for the meaningful assessment of the short and long term impact of the abandonment of the existing Line 3 pipeline, as well as the impacts from tar sands extraction, greenhouse gases, climate change and additional, future pipeline abandonment from the decreased demand for crude oil. The White Earth Band of Ojibwe did FIND that the Minnesota Chippewa Tribe's Anishinabe Cumulative Impacts Assessment is superior to the EIS that has been approved by the Minnesota PUC in examining the cumulative impacts from the proposed Line 3 project upon surface waters, groundwater, fish, wildlife, waterfowl, wild rice, plants, as well as the broader environmental consequences resulting from the proposed Line 3 project, which necessarily requires prohibiting the Line 3 Pipeline Replacement, new route corridor for the replacement pipeline across the 1855 ceded territory in violation of White Earth Band of Ojibwe and 1855 Treaty Authority established codes, laws and customs required consent as co-owners.

For the Chippewas of the Mississippi, clean water is inextricably linked to the self-sufficiency, economic development and security of present and future generations of northern Minnesota's tribal communities.  The upper Mississippi watershed, from the Headwaters adjacent to White Earth Reservation through the various 1855 reservations and ceded territories through Brainerd and St. Cloud, needs to be understood as one, long, continuous, first in time, priority quality water property rights for the Chippewas of the Mississippi to enjoy and protect in perpetuity.

The White Earth Band of Ojibwe in exercise of original, retained jurisdiction and sovereignty of the thousands of treaty beneficiaries and the jurisdiction of the federally recognized reservation with tribal regulatory authorities for the reserved, priority, water quality

---

[1] See *Climate change affects lakes, walleye in complex ways,* by Elizabeth Dunbar on Minnesota Public Radio, Sept. 9, 2015 at https://www.mprnews.org/story/2015/09/09/walleye-climate-change

[2] See *Ojibwe leader says Mille Lacs walleye have not recovered yet* by Tony Kennedy Star Tribune  OCTOBER 1, 2017 at http://www.startribune.com/ojibwe-leader-says-mille-lacs-walleye-have-not-recovered-yet/448842053/

property rights and *Rights of Manoomin* now requires that the Minnesota Department of Natural Resources fulfill its legal obligation under federal laws to honor and respect the White Earth Band's and *Chippewas' of the Mississippi* rights to parity recognition of usufructuary property rights in the 1855 treaty ceded territory, same as the 1837 and 1854, and more importantly include all of the "off reservation" interconnected waters quality property rights as describe and provided for in the Winter's Doctrine for the upper Mississippi River in Minnesota, for the same environmental protection treatment and as "on reservation" for the Line 3 Clean Water Act permitting under Section 401 with appropriate consultation and *required consent* of the *Chippewas of the Mississippi*.



    Of particular, direct, environmental concern is that the preferred pipeline route crosses some of the most important wild rice waters, streams, rivers, lakes and aquifers.



According to the DNR Line 3 Route Map, multiple state forests will be crossed as well, which after federal lands are the primary, off-reservation public lands and waters where tribal members' usufructuary property rights to hunt, fish, trap and gather will be directly impacted by the new pipeline route corridor.



The White Earth Band understands that the federal law, Public Law 83-280 (18 U.S.C. § 1162, 28 U.S.C. § 1360) does not authorize state regulation of the use of such property [including water rights] in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

Consequently, the White Earth Band of Ojibwe requires written confirmation by the State of Minnesota, DNR and MPCA that separate, free and prior, informed consent (as required by the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP)) is required by and from the Chippewas of the Mississippi as co-owner, for this Line 3 pipeline project, as original owners of the undivided, one-half interest in the ceded territories' natural resources and waters that unite them, within the State of Minnesota regarding eminent domain over public waters and lands within the 1855 ceded territory.

Further consultation will be necessary.  If you have any questions or need of further information about Rights of Manoomin and consent, please call on me at 218-935-2488 and/or Frank Bibeau, attorney at law representing White Earth for consultation on Line 3 and 1855 treaty rights at 218-760-1258 or frankbibeau@gmail.com.

Sincerely,

*Monica M Hedstrom*

Monica M Hedstrom, Director
Natural Resources

Attachment:  Chairman Tibbett's Jan. 25, 2019 letter to Governor Walz

cc:    Laura Bishop, Minnesota Pollution Control Agency Commissioner
       Keith Ellison, Minnesota Attorney General
       Eugene "Umsy" Tibbetts, acting Chairman, White Earth
       Alan Roy, Secretary/Treasurer, White Earth
       Ray Auginaush, Sr., District 1 White Earth
       Kathy Goodwin, District 2, White Earth
       Randy Goodwin, Executive Director, White Earth
       Frank Bibeau, Executive Director 1855 Treaty Authority

# EXHIBIT D

April 10, 2020

Commissioner Laura Bishop
Minnesota Pollution Control Agency
520 Lafayette Road North
St. Paul, Minnesota 55155-4194

Submitted online at http://401wqc.mpca.commentinput.com/

Re:    Clean Water Act Section 401 Permitting for Enbridge Line 3 Project
       Tribal Water Rights and Environmental Jurisdiction Comments

Commissioner Bishop:

These comments are submitted on behalf of the **Red Lake Band of Chippewa Indians** and **White Earth Band of Ojibwe**, in addition to the *Joint Comments* filed on behalf of Friends of the Headwaters, Sierra Club, and Honor the Earth, with the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe.

The purpose of these comments are to raise concerns regarding federally and treaty protected Chippewa Tribal *Water Rights* and Environmental *Jurisdiction*, which ultimately require free, prior, informed consent before the Minnesota Pollution Control Agency may grant a regulatory easement or permit across water resources in which the state and Tribes have a common property interests, but individual rights.  Consequently, because the MPCA's Line 3 water quality permitting violates federal laws protecting important Chippewa *water rights*, the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe formally request a full hearing, with contested case proceedings on the record for this matter.

If you have any questions or need of further assistance with regard to these matters please call on Mr. Joseph Plumer or myself.  Mii gwitch.

/s/  Joseph Plumer                          /s/  Frank Bibeau
Joseph Plumer, Attorney                     Frank Bibeau, Attorney
Red Lake Band of Chippewa Indians           White Earth Band of Ojibwe
9352 North Grace Lake Road                  51124 County Road 118
Bemidji, MN 56601                           Deer River, MN 56636
Telephone: (218) 556-3824                   Telephone: (218) 760-1258
Email: jplumer@paulbunyan.net               Email: frankbibeau@gmail.com

**Chippewas' Tribal Water Rights and Environmental Jurisdiction
Comments to MPCA from Red Lake Band of Chippewa Indians
and the White Earth Band of Ojibwe for Line 3 CWA permitting**

I.   **THE CLEAN WATER ACT (CWA) DOES NOT APPLY TO INDIAN TRIBES
BECAUSE CONGRESS DID NOT INDICATE A CLEAR AND PLAIN INTENT
FOR THE ACT TO APPLY TO INDIAN TRIBES AS EVIDENCED BY THE
PLAIN LANGAUGE, LEGISLATIVE HISTORY, AND SURROUNDING
CIRCUMSTANCES OF THE ACT**

Limitations on tribal self-government and inherent tribal sovereign authority cannot be
implied; any limitation must be expressly stated or otherwise made clear from surrounding
circumstances and legislative history. In this case, the MPCA may not apply the provisions of the
Clean Water Act (CWA) to the impacted Indian tribes without a clear and plain intent by
Congress. Without a clear and plain intent by Congress for the CWA to apply to Indian tribes,
the Minnesota Pollution Control Agency (MPCA) may not properly impose the requirements of
these laws if they impact the tribes' rights of self-governance.

A.   **Longstanding Federal Indian Law Principles Require a Clear and Plain
Intent by Congress to Limit Tribes of Their Inherent Sovereign Authority**

"For nearly two centuries now, [the Supreme Court] has recognized Indian tribes as
'distinct, independent political communities,' qualified to exercise many of the powers and
prerogatives of self-government[.]" *Plains Commerce Bank v. Long Family Land & Cattle Co.*,
554 U.S. 316, 327 (2008) (citations omitted). "Although no longer 'possessed of the full
attributes of sovereignty,' [Indian tribes] remain a 'separate people, with the power of regulating
their internal and social relations.'" *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55 (1978)
(citations omitted). Inherent in an Indian tribe's sovereignty is the tribe's power to "make their
own substantive law in internal matters and to enforce that law in their own forums." *Id.* at 55–
56 (1978) (citations omitted). An Indian tribe's "general authority, as [a] sovereign" includes the

power "to control economic activity within its jurisdiction[.]" *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 137 (1982). The Supreme Court recognizes the unique nature of Indian tribes in the United States, and does not view tribes as private organizations. *United States v. Mazurie*, 419 U.S. 544, 557 (1975) (stating that the Supreme Court's decisions "establish the proposition that Indian tribes within 'Indian country' are a good deal more than 'private, voluntary organizations'").

As dependent sovereigns, Indian tribes are subject to Congress' plenary authority. *United States v. Lara*, 541 U.S. 193, 200 (2004) ("[T]he Constitution grants Congress broad general powers to legislate in respect to Indian tribes, powers that we have consistently described as 'plenary and exclusive.'") (citations omitted). The Supreme Court has repeatedly recognized that Congress is the branch of government best-equipped "to weigh and accommodate the competing policy concerns" when deciding whether to limit the inherent sovereignty or treaty rights of Indian tribes. *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2037–38 (2014) (citation omitted). But "unless and until Congress acts, the tribes retain their historic sovereign authority." *Id.* at 2030. Additionally, "courts will not lightly assume that Congress in fact intends to undermine Indian self-government." *Id.* at 2032.

The Supreme Court has long held that courts may construe a federal statute as impairing tribal sovereignty only if Congress clearly expresses its intent to reach that result. *See, e.g.*, *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 149–52 (1982); *see also Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 60 (1978) ("[A] proper respect both for tribal sovereignty itself and for the plenary authority of Congress in this area cautions that we tread lightly in the absence of clear indications of legislative history."); *Cohen's Handbook of Federal Indian Law* § 2.01[1], at

3

110 (Nell Jessup Newton ed., 2012) ("Judicial deference to the paramount authority of Congress in matters concerning Indian policy remains a central and indispensable principle of the field of Indian law."). A clear and plain intent may be demonstrated by an "express declaration" in the statute, by the "legislative history," and by "surrounding circumstances." *United States v. Dion*, 476 U.S. 734, 739 (1986).

Respect for tribal self-government is reflected in two canons of construction. First, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit[.]" *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). Second, when Indian tribes are concerned, courts are to "tread lightly in the absence of clear indications of legislative intent." *Merrion*, 455 U.S. at 149.

Here, the application of the CWA, which is silent on the subject of Indian tribes, would be inconsistent with longstanding federal Indian law principles. These principles include the settled Indian law canon of construction that requires construing silence in favor of Indian tribes and the principle that Congress may limit tribal self-government, but only when it expresses a clear and plain intent to do so. Inherent in the inherent sovereignty of Indian tribes is the power to make its own substantive law in internal matters and to enforce that law in their own forum. Because the CWA does not expressly include Indian tribes in the text of the statutes or the legislative history of the laws, the presumption is that Indian tribes' inherent sovereign authority continues to exist in the areas of environmental and water quality. This means that the impacted tribes may adopt and enforce their own environmental protection and water quality standards in their own forums based on their inherent sovereign authority.

4

Additionally, the MPCA must defer to Congress' paramount authority in matters concerning Indian policy to respect the unique relationship between Indian tribes and the United States. The MPCA must also defer to the inherent sovereign authority of the impacted tribes to adopt and enforce their own environmental protection and water quality regulations in their own forums. Accordingly, in the absence of a clear and plain intent by Congress for the CWA to apply to Indian tribes, the MPCA may not properly assert jurisdiction over the impacted tribes.

**II.**   **THE CWA DOES NOT APPLY TO THE IMPACTED TRIBES BECAUSE THE ENVIRONMENTAL PROTECTION AND WATER QUALITY REGULATIONS ARE REGARDED AS STRICTLY INTERNAL MATTERS UNDER EIGHTH CIRCUIT PRECEDENT**

**A.**   **The United States Supreme Court's Decision in *Tuscarora* is the Starting Point to Determine Whether Federal Laws of General Applicability Apply to Indian Tribes**

The United States Supreme Court's decision in *Fed. Power Comm'n v. Tuscarora Indian Nation*, 362 U.S. 99, 116 (1960), concluded that it is "now well settled by many decisions of this Court that a general statute in terms applying to all persons includes Indians and their property interests." However, the Supreme Court's statement in *Tuscarora* was not part of the Court's holding or necessary to it because there was ample evidence supported by congressional intent to apply the particular statute at issue to the off-reservation land owned by the Tuscarora Indian Nation in fee simple.[1]

---

[1] *See NLRB v. Little River Band of Ottawa Indians Tribal Gov't*, 788 F.3d 537, 557 (6th Cir. 2015) (McKeague, J., dissenting) ("While the *Tuscarora* statement has blossomed into a 'doctrine' in some courts in relation to some federal laws, closer inspection of the *Tuscarora* opinion reveals that the statement is in the nature of dictum and entitled to little precedential weight."); *San Manuel Indian Bingo & Casino v. NLRB*, 475 F.3d 1306, 1311 (D.C. Cir. 2007) (stating that the *Tuscarora* statement is in tension with "longstanding principles" of federal Indian law and of "uncertain significance").

5

In *Tuscarora*, the Supreme Court addressed the issue of whether the Federal Power Act ("FPA") authorized the condemnation of off-reservation land owned in fee simple by the Tuscarora Indian Nation. *Id.* at 110 (describing the issue in the case as "whether the Tuscarora lands covered by the Commission's license are a part of a 'reservation' as defined and used in the Federal Power Act"). The Court held that the FPA did authorize the condemnation of off-reservation land owned by the Tuscarora Indian Nation. *Id.* at 123. To resolve the issue, the Court looked to whether the FPA covered off-reservation lands owned by Indian tribes. *Id.* The Court concluded that the FPA "gives every indication that, within its comprehensive plan, Congress intended to include lands owned or occupied by any persons or persons, including Indians." *Id.* at 118. Ultimately, the Court determined that because the Tuscarora Indian Nation owned the land in fee simple, the lands did not satisfy the statutory definition of "reservation,"[2] and thus the federal government's taking of the land was permitted under the FPA. *Id.*

Here, unlike the CWA, which do not mention Indian tribes in the text of the statute or its legislative history, the FPA gave "every indication" to include lands owned or occupied by any landowner. Additionally, in *Tuscarora*, the Supreme Court addressed only issues of land ownership, not "questions pertaining to the tribe's sovereign authority to govern land." *NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1198 (10th Cir. 2002). The Court's statement in *Tuscarora* regarding statutes of general applicability was "made in the context of property rights, and [does] not constitute a holding as to tribal sovereign authority to govern." *Id.* at 1199. Furthermore, all

---

[2] The FPA defines "reservation" to include "national forests, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks[.]" 16 U.S.C. § 796(2).

three cases that the Court cited in support of its statement addressed only whether federal tax statutes applied to *individual Indians*.[3] These cases do not address the very different question of whether a federal statute should be construed as displacing a *tribe's* inherent sovereign authority. Additionally, in the sixty years since *Tuscarora* was decided, the Supreme Court has never cited the statement again.

Because the Supreme Court's statement in *Tuscarora* is dicta that is inconsistent with longstanding federal Indian law principles, the MPCA may not properly rely on *Tuscarora* to assert jurisdiction over the impacted tribes. Rather, the MPCA must defer to applicable federal Indian law principles and relevant Eighth Circuit precedent, and focus on how the application of the CWA to the impacted tribes displaces the tribes' inherent sovereign authority to regulate internal matters.

### B. The Minnesota Pollution Control Agency Must Defer to Eighth Circuit Precedent to Determine Whether the Permitting Processes Now Before the Agency are Applicable to Indian Tribes

Tribes located in Minnesota are within the jurisdiction of the United States Court of Appeals for the Eighth Circuit. Therefore, the MPCA must defer to Eighth Circuit precedent to determine whether the CWA may be applied to the impacted tribes.

In *EEOC v. Fond du Lac Heavy Equip. & Const. Co.*, 986 F.2d 246 (8th Cir. 1993), the Eighth Circuit held that Age Discrimination in Employment Act ("ADEA"), a generally applicable federal statute,[4] does not apply to an employment discrimination action involving a

---

[3] *See Okla. Tax Comm'n v. United States*, 319 U.S. 598 (1943); *Superintendent of Five Civilized Tribes v. Comm'r*, 295 U.S. 418 (1935); *Choteau v. Burnet*, 283 U.S. 691 (1931).

[4] The ADEA defines the term "employer" to mean "a person engaged in an industry affecting commerce who has twenty-five or more employees" and also "(1) any agent of such person, and (2) a State or

7

member of an Indian tribe, a tribal equipment and construction company as the employer, and reservation employment because the "dispute involves a strictly internal matter" and application of the ADEA would affect the "tribe's specific right of self-government." *Id.* at 249. Notably, in *Fond du Lac*, the Eighth Circuit rejected the Ninth Circuit's framework in *Donovan v. Coeur d' Alene Tribal Farm,* 751 F.2d 1113 (9th Cir. 1985) in applying generally applicable federal statutes to Indian tribes. *Id.* 248 n.3 (noting that the Ninth Circuit's application of its "self-government exception" to *Tuscarora*'s presumption "is limited to purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations").

First, in *Fond du Lac*, the Eighth Circuit acknowledged the Supreme Court's broad language in *Tuscarora*, but concluded that an internal ADEA dispute between an Indian tribe and a tribal member affects "the tribe's specific right of self-government" such that the "general rule of applicability [from *Tuscarora*] does not apply." *Id.* at 249. The court explained that "[s]pecific Indian rights will not be deemed to have been abrogated or limited absent a 'clear and plain' congressional intent." *Id.* (citing *United States v. Dion*, 476 U.S. 734, 738 (1986). Additionally, the court further explained that "[a]lthough the specific Indian right involved usually is based upon a treaty, such rights may also be based upon statutes, executive agreements, and federal common law." *Id.* at 248.

In *Fond du Lac*, the Eighth Circuit determined that the "dispute [at issue in the case] involves a strictly internal matter." *Id.* at 249. The Eighth Circuit characterized the dispute in issue in the case as "between an Indian applicant and an Indian tribal employer." *Id.* Because the

---

political subdivision of a State, and any interstate agency, but such term does not include the United States, a corporation wholly owned by the Government of the United States, or a State or political subdivision thereof." 29 U.S.C. § 630(b).

"Indian applicant is a member of the tribe, and the business is located on the reservation[,]" the court found that "[s]ubjecting such an employment relationship between the tribal member and his tribe to federal control and supervision dilutes the sovereignty of the tribe." *Id.* The court further explained:

> The consideration of a trib[al] member's age by a tribal employer should be allowed to be restricted (or not restricted) by the tribe in accordance with its culture and traditions. Likewise, disputes regarding this issue should be allowed to be resolved internally within the tribe. Federal regulation of the tribal employer's consideration of age in determining whether to hire the member of the tribe to work at the business located on the reservation interferes with an intramural matter that has traditionally been left to the tribe's self-government. *Id.* at 249.

In conclusion, the Eighth Circuit found that because the tribe's right self-government could be such a "specific right," whenever a general federal regulatory law interfered with tribal self-government, the law was not applicable to Indian tribes absent clear evidence of congressional intent for the law to apply. *Id.* Under the Eighth Circuit's framework, there is no presumption that a federal statute of general applicability applies to Indian tribes as in the Ninth Circuit.

**C.   The Impacted Tribes' Regulation of Their Own Environmental Protection and Water Quality Standards are Strictly Internal Matter that Fall Solely within the Jurisdiction of the Impacted Tribes.**

Here, the issues of environmental protection and water quality regulation by the impacted tribes are internal matters and the application of the CWA would interfere with the impacted tribes' "specific right of self-government." *See Fond du Lac*, 986 F.2d at 249. Like the ADEA, the CWA are generally applicable federal statutes that do not mention Indian tribes in the text of

the statutes or in their legislative history. Furthermore, the application of the CWA to the impacted tribes would interfere with the tribes' exercise of self-government by restricting the tribes from adopting and enforcing their own environmental protection and water quality standards in their own forums. MPCA and federal regulation of the environmental protection and water quality of the impacted tribes substantially interferes with the internal matters of the tribes. Consequently, the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe formally requests a full hearing, with contested case proceedings.

III.   **CONGRESS SPECIFICALLY AND EXPRESSLY EXEMPTED *WATER RIGHTS* FROM THE 1953 JURISDICTIONAL GRANT UNDER PUBLIC LAW 280 TO ALL STATES INCLUDING MINNESOTA.**

A.   **Public Law 280 specifically and expressly applies to all of Indian Country within the State of Minnesota, except the Red Lake Reservation.**

Public Law 83-280 (18 U.S.C. § 1162(b) and 28 U.S.C. § 1360(b)) does not

authorize the alienation, encumbrance, or taxation of any real or personal property, *including water rights*, belonging to any Indian or any Indian tribe, band, or community that is held in trust by the United States or is subject to a restriction against alienation imposed by the United States; or shall authorize regulation of the use of such property in a manner inconsistent with any Federal treaty, agreement, or statute or with any regulation made pursuant thereto; or shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.

Public Law 280 (18 U.S.C. § 1162(b), 28 U.S.C. § 1360(b)).

Here, the Minnesota Pollution Control Agency is attempting to unilaterally deprive Chippewa Tribes' and treaty beneficiaries' rights to protect and maintain the abundant, high quality, clean waters necessary for Manoomin (wild rice) and other important fisheries and natural aquatic resources' ecosystems.  The Chippewa tribes and

10

members understand that public waters of Minnesota and the natural resources which rely upon them are threatened and/or impacted; and are where most of the wild rice grows. The Chippewa tribes and members cannot ignore that *Climate change affects lakes, walleye in complex ways*[5] and that the State is trying to preserve as few as 176 designated refuge lakes, where walleye's favorite food the *tullibee* still live, hoping the *tullibee* will be able to survive even with continued warming.  It is obvious that the State is not able to adequately protect waters and fisheries.  The Chippewa tribes and members understand that any increase in tar sands extraction will only speed up climate change and compound environmental and aquatic problems in Minnesota, and when walleye fishing people can't fish Mille Lacs, they usually shift further north to Big Sandy, Pokegama, Big Winnibigoshish, Cass Lake and Leech Lake, which are all original 1855 reservations.

       As part of the Line 3 environmental review process the White Earth Band of Ojibwe helped develop and has adopted the Minnesota Chippewa Tribe's *Anishinabe Cumulative Impacts Assessment*  (ACIA) as the White Earth Band's environmental risk and evaluation tool for the meaningful assessment of the short and long term impact of the abandonment of the existing Line 3 pipeline, as well as the impacts from tar sands extraction, greenhouse gases, climate change and additional, future pipeline abandonment from the decreased demand for crude oil. The Red Lake Band of Chippewa Indians adopted Resolution No. 58-18 opposing the new corridor and pipeline abandonment for Line 3 and *Finding* the ACIA superior to the Public Utilities Commission's Environmental Impact Statement (EIS) and chose the No Build Alternative.

---

[5] See *Climate change affects lakes, walleye in complex ways*, by Elizabeth Dunbar on Minnesota Public Radio, Sept. 9, 2015 at https://www.mprnews.org/story/2015/09/09/walleye-climate-change

The White Earth Band of Ojibwe also *Found* that the Minnesota Chippewa Tribe's Anishinabe Cumulative Impacts Assessment superior to the EIS that has been approved by the Minnesota PUC in examining the cumulative impacts from the proposed Line 3 project upon surface waters, groundwater, fish, wildlife, waterfowl, wild rice, plants, as well as the broader environmental consequences resulting from the proposed Line 3 project. These cumulative impacts necessarily require denying the Line 3 Pipeline Replacement 401 permits. The MPCA must deny the route corridor across the 1855 ceded territory for being in violation of White Earth Band of Ojibwe established off-reservation conservation codes and customs and most importantly for lacking the required consent from the *Chippewas of the Mississippi* as co-owners of the freshwater resources.

Therefore, the White Earth Band of Ojibwe and Red Lake Band of Chippewa Indians require written confirmation from the State of Minnesota MPCA that separate, free and prior, informed consent (as required by the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP)) is required by and from the Chippewas as riparian, water rights co-owners-- for considering to permit this Line 3 pipeline project regulatory easement across the ceded territories' natural resources and waters that unite them. Consequently, because the MPCA's Line 3 water quality permitting violates federal laws protecting important Chippewa water rights, the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe formally requests a full hearing, with contested case proceedings on the record.

B.   **Chippewa Water Quality Property Rights.**

Over 100 years ago the United States Supreme Court established the *Winters Doctrine,* which provided for a first in time, priority *reserved* rights (in waters that arise on, border,

traverse, or underlie reservations). When the federal government created the Indian reservations, water rights were reserved in sufficient quantity to meet the purposes for which the reservations were established. *Winters v. United States*, 207 U.S. 564 (1908). Two decades ago the United States Supreme Court held we are to "interpret Indian treaties to give effect to the terms as the Indians themselves would have understood them." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U. S. 172, 196 (1999), Treaties are to be "interpreted liberally in favor of the Indians," id. at 194 n. 5, and any ambiguities are to be resolved in the Indians' favor, *Winters v. United States*, 207 U.S. 564, 576–77 (1908). See also *United States v. Bresette*, 761 F. Supp. 658, 661 (D.Minn.1991) ("It is axiomatic that Indian treaty rights are to be afforded a broad construction and, indeed, are to be interpreted as the Indians understood them because the Indians were generally unlettered and the government had great power over the Indians with a corresponding responsibility toward them." (Emphasis in original)).

A year ago the United States Supreme Court in *Herrera v. Wyoming*, 587 U.S. ___ (May 20, 2019) re-affirmed *Mille Lacs* treaty rights analysis declaring that "[t]his case is controlled by *Mille Lacs*", which established that the crucial inquiry for treaty termination analysis is whether Congress has "clearly express[ed]" an intent to abrogate an Indian treaty right, 526 U. S., at 202, or whether a termination point identified in the treaty itself has been satisfied, id., at 207. In *Mille Lacs*, the Court declared "[i]n fact, the entire 1855 Treaty is devoid of any language expressly mentioning usufructuary rights or providing money for abrogation of those rights. These are telling omissions, since federal treaty drafters had the sophistication and experience to use express language when abrogating treaty rights. The historical record, purpose, and context

13

of the negotiations all support the conclusion that the 1855 Treaty was designed to transfer Chippewa land to the United States, not terminate usufructuary rights."

For the 20,000 present day *Chippewas of the Mississippi* clean water is inextricably linked to the self-sufficiency, economic development and security of present and future generations of northern Minnesota's tribal communities.  The circuitous nature of the upper Mississippi River in particular begins adjacent to the White Earth reservation (established by the 1867 Treaty) and then flows through the 1855 ceded territory reservations of Cass Lake, Winnibigoshish, Pokegama, Sandy, Rabbit and Gull Lakes, and then forms the border between the Chippewa territories ceded in 1847 and 1837, with interconnected tributaries, upstream and downstream in all aquatic ecosystems which are the primary sources for important, primary treaty foods like manoomin (wild rice) environments and fisheries.

The best, recent federal cases that best explain how Chippewa rights should be recognized and understood are <u>Minnesota v Mille Lacs</u>[6] (1999) and <u>U.S. v Brown *et al*</u>[7] (8th 2015), also known as *Operation SquareHook*.  The <u>Brown</u> Court reaffirms <u>Mille Lacs</u> and how

> The United States made several treaties with Chippewa Indians during the nineteenth century, including two relevant to this case. In July 1837, over one thousand Chippewa Indians gathered at Fort Snelling while their chiefs negotiated with Wisconsin Territorial Governor Henry Dodge who represented the United States. Documents Related to the Negotiation of the Treaty of July 29, 1837, reprinted in Satz, Chippewa Treaty Rights 131–153, at 131 ("1837 Treaty Journal"). The United States sought to purchase land east of the Mississippi River

---

[6] See <u>Minnesota v. Mille Lacs Band of Chippewa Indians</u>, 526 U.S. 172 (1999).

[7] See <u>U.S. v. Brown</u>, 777 F.3d 1025 (8th Cir. 2015). (It is well settled, however, that an individual Indian may assert usufructuary rights in a criminal prosecution. For example, the Supreme Court stated in <u>United States v. Dion</u> that hunting and fishing "treaty rights can be asserted by Dion as an individual member of the Tribe." 476 U.S. at 738 n. 4, 106 S.Ct. 2216. Evaluating usufructuary rights in <u>United States v. Winans</u>, the Court explained that while "the negotiations were with the tribe," treaties "reserved rights, however, to every individual Indian, as though named therein." 198 U.S. at 381, 25 S.Ct. 662.

in present day central Minnesota and Wisconsin because of its desirable pine timber. Id. at 131–32, 140.

During these negotiations, the Chippewa chiefs emphasized the importance of reserving their rights to fish, hunt, and gather on the land, also called usufructuary rights. According to the treaty journal, Ma-ghe-ga-bo stated, "Of all the country that we grant to you we wish to hold on to a tree where we get our living, & to reserve the streams where we drink the waters that give us life." 1837 Treaty Journal at 142.

The secretary who recorded the proceedings noted that he transcribed the statement as provided by the underqualified interpreters, but he "presume[d] it to mean that the Indians wish to reserve the privilege of hunting & fishing on the lands and making sugar from the Maple." Id. Flat Mouth, chief of the Pillager band which resided at Leech Lake, reiterated the importance of reserving usufructuary rights on the ceded lands:

> My Father. Your children are willing to let you have their lands, but they wish to reserve the privilege of making sugar from the trees, and getting their living from the Lakes and Rivers, as they have done heretofore, and of remaining in this Country.... You know we can not live, deprived of our Lakes and Rivers; ... we wish to remain upon them, to get a living.[8]

Governor Dodge agreed to reserve these rights for the Chippewa Indians. 1837 Treaty Journal at 146. Article 5 of the 1837 treaty provides, "The privilege of hunting, fishing, and gathering the wild rice, upon the lands, the rivers, and the lakes included in the territory ceded, is guarantied to the Indians, during the pleasure of the President of the United States." Treaty with the Chippewa, July 29, 1837, art. 5, 7 Stat. 536 ("1837 Treaty").

Flat Mouth was an important Chippewa Chief, treaty negotiator and signatory for the 1837 Treaty, who resided at Leech Lake.  More importantly here, Flat Mouth was an important Chippewa Chief, treaty negotiator and signatory for the 1855 Treaty as well.  The *Mille Lacs* Supreme Court found "the entire 1855 Treaty, in fact, is devoid of any language expressly

---

[8] Id. at 145.

mentioning-much less abrogating-usufructuary rights.  Similarly, the Treaty contains no language providing money for the abrogation of previously held rights."  The *Chippewas of the Mississippi* understand Flat Mouth and other signatory chiefs did not change their minds about exercising usufructuary rights between 1837 and 1855.

Consequently, for the *Chippewas of the Mississippi*, abundant, clean water is inextricably linked to the self-sufficiency, economic development and security of present and future generations of northern Minnesota's tribal communities' health and welfare.  The upper Mississippi watershed (in light blue on the map), from the Headwaters of the Mississippi River adjacent to White Earth Reservation through the various, original 1855 reservations[9] and ceded territories through Brainerd to St. Cloud, must be recognized as one, long, continuous, first in time, connected chain of reservations, seamlessly linked together as a common, *Chippewas' of the Mississippi* priority quality water property rights under the *Winter's Doctrine* including all the upper Mississippi watershed tributaries, lakes, aquifers, wetlands and natural resources, reserved for the *Chippewas of the Mississippi* to enjoy and protect.

---

[9] See also *Menominee Tribe v. United States*, 391 U.S. 404 (1968)(the Supreme Court ruled that the Menominee Indian Tribe kept their historical hunting and fishing rights even after the federal government ceased to recognize the tribe.)



An important part of protecting Chippewa sovereign rights is our ongoing struggle to preserve a culture that is best understood in terms of our relationship with the natural environment. There is no economic framework that can properly define the value of manoomin (wild rice) to the Ojibwe people because manoomin is central to Ojibwe cultural identity, spiritual traditions, and physical well-being. Most significant is that wild rice serves as an important indicator species to the ecology of Minnesota's lakes and rivers and provides critical food and habitat to both endemic and migratory species. Tribal members continue to harvest and rely upon manoomin for religious purposes including naming ceremonies, funerals, Midewiwin ceremonies, and various seasonal feasts. These activities are critical components in perpetuating Anishinaabe lifeways and cultural practices, whereby the Ojibwe-Anishinaabe spiritual beliefs

17

mandate the use of certain plants, animals, and fish in ceremonies attendant to hunting, fishing, and gathering activities and these ceremonies ensure the perpetuation of the resources and the physical, mental, and spiritual well-being of the person for bimaadiziwin "living a good life".

The White Earth Band of Ojibwe has given notice that the State of Minnesota lacks unilateral authority to grant Section 401 Clean Water Act (regulatory water quality easements) permits for Enbridge's Line 3R pipeline activities across Tribal resources, without *Chippewas of the Mississippi's* Tribal consent. The United States understood at the beginning of land cession treaties that the Chippewa expressly reserved "hunting, fishing, and gathering the wild rice, upon the lands, the rivers, and the lakes included in the territory ceded" in 1837. Moreover, MPCA's Line 3 water quality permitting violates federal laws protecting important Tribal water rights. Consequently, the White Earth Band formally requests a full hearing, with contested case proceedings.

C.   **Chippewas' Consent Required for MPCA Regulatory Easements for impacting Chippewa Water Property Rights.**

The recent *Operation Squarehook* cases like *United States v Good*[10] in 2013 *distinguished* Red Lake Chippewa usufructuary property rights as "not in common" with non-Indians, from the west coast treaty cases where some Tribal rights were "in common" with citizens of the territory or the United States in N 4 explaining

> that inquiry was necessary in *Puyallup*[11] because the treaty rights at issue protected hunting and fishing "in common with" other citizens of the territory so "any ultimate findings on the conservation issue must also cover the issue of equal protection implicit in the phrase 'in common with.' "*Puyallup*, 391 U.S. at 395, 403. Here, the treaty

_____

[10] *U.S. v Good*, 2013 WL 6162801, D. Minn. Criminal No. 13-072,Nov. 25, 2013. See also *U.S. v Brown, supra* from Leech Lake Reservation. *Operation Squarehook* included Tribal netters from White Earth, Leech Lake and Red Lake being charged for selling fish.

[11] See *Puyallup Tribe v. Dep't of Game of Wash.*, 391 U.S. 392, 398 (1968).

contains no language requiring the Chippewa to share their fishing rights "in common" with non-Indians. Rather, courts in this district have already held that the broad scope of the Chippewa's fishing rights precludes state regulation of tribe members' fishing and hunting. *Herbst,* 334 F. Supp. at 1006. Thus, the Court need not engage in this third inquiry because the treaty language does not contemplate that the Chippewa share their hunting and fishing rights with non-Indians. *See United States v. Bresette,* 761 F. Supp. 658, 664 (D.Minn.1991) (rejecting government's argument that "a statute of general applicability may limit Indian treaty rights under *Puyallup* even if it is not a clear abrogation of those rights as required under *Dion* " finding that "the court [in *Puyallup* ] interpreted the Indians' fishing rights to be in common with other groups," and therefore determined that "the particular conservation measures did not exceed the Indians' understanding of the treaty" (emphasis omitted)). Thus, in *Puyallup,* the Supreme Court determined that the treaty **did not** protect the Indians' exclusive right to fish in the manner and mode that the state prohibited, so there was no need to consider abrogation, but only whether those state regulations were valid conservation measures that did not discriminate against Indians. *Puyallup,* 391 U.S. at 395–403. Here, the Court concludes that Defendants **do** have a treaty-protected right to the fishing underlying the indictment, but Congress has not abrogated that right. Thus, there is no need to analyze whether the Lacey Act or the regulations are valid nondiscriminatory conservation measures, because even if they were, they cannot be applied to Defendants in violation of their treaty rights.

(Emphasis in original).

Therefore, the White Earth Band of Ojibwe and Red Lake Band of Chippewa Indians requires written confirmation by the State of Minnesota MPCA that separate, free and prior, informed consent (as required by the United Nations Declaration on the Rights of Indigenous Peoples (UNDRIP)) is required by and from the Chippewas as riparian, water rights co-owners-- for considering to permit this Line 3 pipeline project regulatory easement across the ceded territories' natural resources and the waters that unite them.  Consequently, because the MPCA's Line 3 water quality permitting violates federal laws protecting important Chippewa water rights, the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe formally requests a full hearing, with contested case proceedings on the record.

## CONCLUSION

Chippewa Tribes' and treaty beneficiaries' *water rights* are not subject to regulation by the MPCA and Minnesota cannot use the Clean Water Act process and state eminent domain to unjustly take U.S. Constitutionally and federally protected tribal property water rights or usurp protected tribal rights of consent.   Consequently, because the MPCA's Line 3 water quality permitting violates federal laws protecting important Chippewa water rights, the Red Lake Band of Chippewa Indians and White Earth Band of Ojibwe formally request a full hearing, with contested case proceedings on the record.

Respectfully submitted April 10, 2020 by:

/s/  Joseph Plumer                                    /s/  Frank Bibeau

Joseph Plumer, Attorney                        Frank Bibeau, Attorney
Red Lake Band of Chippewa Indians     White Earth Band of Ojibwe
9352 North Grace Lake Road               51124 County Road 118
Bemidji, MN 56601                             Deer River, MN 56636
Telephone: (218) 556-3824                    Telephone: (218) 760-1258
Email: jplumer@paulbunyan.net            Email: frankbibeau@gmail.com

# EXHIBIT E

Senator
John Marty

**Senate**
State of Minnesota

December 3, 2020

Minnesota Public Utilities Commission
*Via email*

Dear Chair Sieben and Commission Members:

I write this last-minute appeal urging you to stay construction of the Line 3 replacement until court challenges have been considered.

There is no doubt the majority of the Commission believes it is appropriate to allow the pipeline replacement project to proceed. This is not an attempt to change your decision.

Instead, granting a stay of construction allows the PUC to acknowledge that others have valuable perspectives and should be allowed their day in court. To date, the perspectives of the Red Lake and White Earth Nations, who have rights to treaty lands through which this new corridor will run, have not been taken into account. In the Certificate of Need, the Commission omitted discussion of treaties from the order, determining that while the ALJ report considered them, the PUC did not need to.[1]

Our long history of abuse and mistreatment of native communities and unwillingness to respond to their grievances has gone on far too long. If construction is allowed to proceed at this time, the project will be largely completed before their considerations are taken up in court.

This is also an appeal to let other scientific perspectives represented in cases before the court to be heard. The Commission dismissed from consideration the Administrative Law Judge's finding that the Line 3 replacement project would increase greenhouse gases by 193 million tons of CO2 per year. *That finding shows that the increase in greenhouse gas-emitting fuel pumped through the new Line 3 pipeline, for use elsewhere, is greater than the greenhouse gas emissions from the entire economy of the state of Minnesota!*

---

[1] Footnote 18 of the September 2018 order states: "For example, the ALJ Report included a section discussing the treaties between the federal government and the Native American sovereign nations located in Minnesota. The Commission concludes that this discussion is not necessary to the Commission's decision, and therefore does not adopt these findings."

The Commission's decision to ignore that terrible reality was based on the fact that differing studies will come up with different estimates of climate impact. In essence, the Commission decided that because we cannot know the precise climate impact of the pipeline, we will ignore the entire impact. That's akin to saying that "because we cannot accurately measure the greenhouse gas emissions from Minnesota's economy, we can act as if there are no greenhouse gas emissions from Minnesota's economy."[2]

The Commission does not need to change its mind to recognize that other reasonable minds deserve a meaningful chance to be heard in court. Without a stay, these voices will effectively lose that opportunity before irreversible damage is done.

To use the analogy about "closing the barn door after the horse is already out of the barn," failure to impose a stay on construction is telling those waiting for their day in court that "the horse isn't just out of the barn, but is racing around the track and is now on the homestretch." Your failure to impose a stay will make their day in court meaningless.

For all of those with legitimate issues in court – for the Red Lake and White Earth Nations, whose history and voices are different from yours, and for the climate issues on which reasonable minds differ with you – please recognize that the delay is a reasonable price to pay for getting this decision right. Please impose a stay to allow this to be reviewed in court.

Thank you,

John Marty

---

[2] Footnote 147 of the September 2018 order states: "But the FEIS acknowledged the limitations of the lifecycle greenhouse gas analysis: 'Note that there are assumptions and data limitations in the characterization of life-cycle [greenhouse gas] emissions that vary between studies. As a result, the [greenhouse gas] emissions can differ substantially from one study to the next. Since the studies reviewed do not consistently disclose the details of their analysis, and often rely on proprietary models and data, a thorough assessment of the reasons for this variability is not possible.' FEIS at 5-466. The Commission therefore does not adopt the ALJ Report at finding 676 and those findings that rely on finding 676."  [ALJ finding 676 spells out the social cost of carbon (lifecycle climate impact) of the project as $287 billion over 30 years.]

# EXHIBIT F

*CATHERINE J. CHAVERS, PRESIDENT*
*FARON JACKSON, SR., VICE PRESIDENT*

*GARY S. FRAZER, EXECUTIVE DIRECTOR*

*APRIL McCORMICK, SECRETARY*
*DAVID C. MORRISON, SR., TREASURER*



# The Minnesota Chippewa Tribe

*Administration*
  *218-335-8581*
  *Toll Free: 888-322-7688*
  *Fax: 218-335-8496*
*Home Loan*
  *218-335-8582*
  *Fax: 218-335-6925*
*Economic Development*
  *218-335-8583*
  *Fax: 218-335-8496*
*Education*
  *218-335-8584*
  *Fax: 218-335-2029*
*Human Services*
  *218-335-8586*
  *Fax: 218-335-8080*

June 22, 2021

The Honorable Tim Walz
Governor
130 State Capitol
75 Rev. Dr. Martin Luther King Jr Blvd
St. Paul, MN 55155

Re:     Request for Rescinding of DNR Dewatering Permit

Dear Governor Walz:

I write to you today on behalf of the Minnesota Chippewa Tribe regarding the Water Appropriation Permit Amendment No 2018-3420 (Construction Dewatering) that was issued by the Minnesota Department of Natural Resources on June 4, 2021 pursuant to Minnesota Statute §103G.271. The White Earth Reservation was not given sufficient notice, nor did the Department of Natural Resources engage in consultation with the White Earth Reservation in violation of Executive Order 19-24.

The Permit Amendment increases the amount of water that the Enbridge Line 3 Replacement Project may displace from some 510.5 million gallons to 4,982 billion gallons. This is a tenfold increase in the originally approved water appropriation permit. While there was a conversation between a White Earth staff person and a DNR staff person, there was no attempt made at a government-to-government consultation prior to issuing this permit on June 4, 2021.

Given the high temperatures and the low precipitation this season, northern Minnesota is in a moderate draught. Water levels are already dangerously low and displacing this many gallons of water will undoubtedly have a detrimental impact on our wild rice, which is our most sacred food. Time is of the essence, and I ask that you direct the Department of Natural Resources to rescind Water Appropriation Permit Amendment No. 2018-3420 until such time as the Department consults with the White Earth Reservation and all other impacted tribes as contemplated by Executive Order 19-24.

Please contact me if you have any questions or concerns.

Miigwech,

*Catherine Chavers*

Catherine J. Chavers
President

# EXHIBIT G

 **Frank Bibeau <frankbibeau@gmail.com>**

## Fw: Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction Dewatering
7 messages

**Renee Keezer** <Renee.Keezer@whiteearth-nsn.gov>
To: "frankbibeau@gmail.com" <frankbibeau@gmail.com>

Thu, Jul 1, 2021 at 3:45 PM

---

**From:** Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>
**Sent:** Thursday, May 27, 2021 2:30 PM
**To:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
**Subject:** FW: Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction Dewatering

---

**From: Doneen, Randall (DNR)** <randall.doneen@state.mn.us>
**Sent:** Friday, May 14, 2021 2:44 PM
**To:** tgeshick@boisforte-nsn.gov; waynedupuis@fdlrez.com; samoore@boreal.org; ben.benoit@llojibwe.net; Katie.Draper@millelacsband.com; 'deb.dirlam@lowersioux.com' <deb.dirlam@lowersioux.com>; 'gmiller@piic.org' <gmiller@piic.org>; Amanda Wold <amandaw@uppersiouxcommunity-nsn.gov>; jleblanc@redlakenation.org; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; mnorthbird@mnchippewatribe.org; Darren Vogt (DVogt@1854treatyauthority.org) <DVogt@1854treatyauthority.org>; jcoleman@glifwc.org; tina.brown@ho-chunk.com; linda.nguyen@redcliff-nsn.gov; VTateyuskanskan@swo-nsn.gov; sarahs@stcroixojibwe-nsn.gov; scott.walz@shakopeedakota.org
**Cc:** Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction Dewatering

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Tribal Natural Resource Directors:

The Minnesota Department of Natural Resources (DNR) wanted to let you know that we are reviewing a proposal to amend an existing water appropriation permit for the Line 3 pipeline replacement project. The proposed amendment seeks to increase the total amount of groundwater that can be temporarily dewatered from trenches along the route during construction. The proposed amendment would modify the volume permitted, but not the currently approved dewatering methods, whereby water is removed from the trench, stored, and then infiltrated back into the ground in close proximity to the point of each appropriation. This approach limits the duration of any potential impacts to groundwater levels.

**What is being requested?**

Enbridge is requesting an increase in its total permitted dewatering volume from 510.5 million gallons (MG) to 4,982 MG, an increase of 4,472 MG. The proposed amendment also seeks an additional 1.8 MG appropriation for construction dewatering of a pipeline maintenance shop. In addition, 3,683 MG of the proposed increase is

associated with additional dewatering well point systems that are used to dewater the area around the pipeline trench. The increase in well point systems are proposed on 4 of the 5 construction spreads.

- Spread 2 – 11 well point systems for an additional 700 MG
- Spread 3 – 3 well point systems for an additional 2,720.7 MG
- Spread 4 – 3 well point systems for an additional 25.9 MG
- Spread 5 – 17 well point systems for an additional 236.7 MG

**Why is Enbridge seeking this permit amendment?**

The amount of dewatering needed during construction thus far has significantly exceeded what Enbridge anticipated and requested in its original permit application.  The original estimate for construction dewatering was derived from the previous Alberta Clipper project. The alignment of the Line 3 replacement is different than the Alberta Clipper, especially in the eastern portion or new area of the pipeline project, where the line crosses extensive peatland soil types.

In addition, the company converted to well point systems for dewatering, rather than relying on sump pump dewatering.  The company opted to make this shift to assist in meeting construction storm water requirements, as well point systems produce much cleaner water. While the well point systems facilitate meeting construction storm water discharge requirements, it also results in more water being pumped.

The company also has identified a maintenance facility construction effort that will need construction dewatering. This is not part of the corridor, but are required by the Minnesota Public Utility Commission.

**What are the natural resource considerations associated with this amendment request, and how might these be managed?**

The total volume of water requested under this amendment application is large, and would be a significant increase to the currently permitted volume. As such, one of the threshold issues to be evaluated is the implications for the water table aquifer.  The temporary nature of the water appropriation and the distribution of the volume across the length of the route are important considerations in this evaluation. As is the case with the existing permit, there would continue to be temporary localized drawdown of groundwater along the corridor, but any water table impacts from this drawdown would be limited because water will be infiltrated back into the ground in close proximity to the point of appropriation.

Another critical issue for evaluation is management of the water discharge to avoid impacts from inundation and/or sedimentation. The Minnesota DNR and Minnesota Pollution Control Agency (MPCA) are working together to evaluate this issue. Current approaches under consideration include:

- Limiting discharge locations near isolated depressional wetlands and other sensitive water resources.
- Additional measures to ensure adequate oversight of dewatering operations at the increased volume being sought.
- Revisions to the Storm Water Pollution Prevention Plan that would require redundant perimeter controls under certain situations.

**Timing for Decision**

Enbridge anticipates reaching the appropriation limit of 510.5 MG under its existing permit in June. The Minnesota DNR will likely make a decision on the water appropriation permit amendment in early June.

If you have any questions or concerns about this request you can email or call me at (651) 259-5156. Alternatively, I am tentatively scheduling a meeting at 3 PM on Thursday May 27 if you would like to join and have more of a group discussion. Details on meeting will be provided shortly.

Randall Doneen
CAR Section Manager
Ecological and Water Resources
Minnesota Department of Natural Resources

**frankbibeau@gmail.com** <frankbibeau@gmail.com>                    Thu, Jul 1, 2021 at 4:03 PM
To: Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
Bcc: frankbibeau@gmail.com

Mii gwitch Renee,
Were you able to participate in the phone call May 27? Do we know which Indian tribes or bands participated?

Sent from my iPhone

Frank Bibeau
218-760-1258

> On Jul 1, 2021, at 3:45 PM, Renee Keezer <Renee.Keezer@whiteearth-nsn.gov> wrote:

[Quoted text hidden]

---

**Renee Keezer** <Renee.Keezer@whiteearth-nsn.gov>                    Thu, Jul 1, 2021 at 4:08 PM
To: "frankbibeau@gmail.com" <frankbibeau@gmail.com>

Frank,

I did participate on the phone call May 27th. Randall Doneen was the facilitator. Charlie Lippert from Mille Lacs and Wayne Dupuis from Fon Du Lac were in the meeting. There was a woman named Sue but no last name and someone that had their name as MCT. There weren't very many people on the meeting. Did you receive the other email as well?

Renee

---

**From:** frankbibeau@gmail.com <frankbibeau@gmail.com>
**Sent:** Thursday, July 1, 2021 4:03 PM
**To:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
**Subject:** Re: Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction Dewatering

[Quoted text hidden]

---

**frankbibeau@gmail.com** <frankbibeau@gmail.com>                    Thu, Jul 1, 2021 at 4:20 PM
To: Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
Bcc: frankbibeau@gmail.com

Yes I did. We will need to talk and have you as a witness. Was any USACE on the call?

Sent from my iPhone

Frank Bibeau
218-760-1258

> On Jul 1, 2021, at 4:08 PM, Renee Keezer <Renee.Keezer@whiteearth-nsn.gov> wrote:

[Quoted text hidden]

**Renee Keezer** <Renee.Keezer@whiteearth-nsn.gov>                    Thu, Jul 1, 2021 at 4:21 PM
To: "frankbibeau@gmail.com" <frankbibeau@gmail.com>

What is USACE?

**From:** frankbibeau@gmail.com <frankbibeau@gmail.com>
**Sent:** Thursday, July 1, 2021 4:20 PM
[Quoted text hidden]

[Quoted text hidden]

---

**Renee Keezer** <Renee.Keezer@whiteearth-nsn.gov>                    Thu, Jul 1, 2021 at 4:42 PM
To: "frankbibeau@gmail.com" <frankbibeau@gmail.com>

No, there was not anyone there from the Army core of engineers and yes, I am willing to be a witness.


Renee Keezer
Pesticide Coordinator
White Earth Department of Natural Resources

Renee.Keezer@whiteearth-nsn.gov
(218)935-2488 ext:2106

**From:** frankbibeau@gmail.com <frankbibeau@gmail.com>
**Sent:** Thursday, July 1, 2021 4:20 PM
[Quoted text hidden]

[Quoted text hidden]

---

**frankbibeau@gmail.com** <frankbibeau@gmail.com>                    Thu, Jul 1, 2021 at 4:47 PM
To: Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
Bcc: frankbibeau@gmail.com

US Army corps of Engineers

Sent from my iPhone

Frank Bibeau
218-760-1258


On Jul 1, 2021, at 4:21 PM, Renee Keezer <Renee.Keezer@whiteearth-nsn.gov> wrote:


[Quoted text hidden]

# EXHIBIT H

                                          **Frank Bibeau <frankbibeau@gmail.com>**

---

### Fw: Line 3 Construction Dewatering Permit Amendment request
1 message

---

**Renee Keezer** <Renee.Keezer@whiteearth-nsn.gov>                    Thu, Jul 1, 2021 at 3:41 PM
To: "frankbibeau@gmail.com" <frankbibeau@gmail.com>

---

**From:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>
**Sent:** Wednesday, June 9, 2021 2:53 PM
**To:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>; Charlie Lippert <Charlie.Lippert@millelacsband.com>; waynedupuis@fdlrez.com <waynedupuis@fdlrez.com>; mnorthbird@mnchippewatribe.org <mnorthbird@mnchippewatribe.org>
**Cc:** Katie Draper <Katie.Draper@millelacsband.com>; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** RE: Line 3 Construction Dewatering Permit Amendment request

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Renee,

We actually issued the permit amendment last Friday. I have attached a copy of the amended permit and associated record of decision for your information. At this point there are no open comment periods. I have also attached the May 14, 2021 email that was sent to Tribal Natural Resource Directors providing information about the amendment request.

Please let me know if you have additional questions about the amended permit.


Randall Doneen
CAR Section Manager
Ecological and Water Resources
Minnesota Department of Natural Resources

---

**From:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
**Sent:** Wednesday, June 9, 2021 11:30 AM
**To:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>; Charlie Lippert <Charlie.Lippert@millelacsband.com>; waynedupuis@fdlrez.com <waynedupuis@fdlrez.com>; mnorthbird@mnchippewatribe.org <mnorthbird@mnchippewatribe.org>
**Cc:** Katie Draper <Katie.Draper@millelacsband.com>; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** Re: Line 3 Construction Dewatering Permit Amendment request

Randall,

Good morning,

I have a few questions regarding the new dewatering permit. As this is a new permit, is there going to be an open comment period? Will there be consultation with the tribes so they may have the opportunity to submit comment if they desire to do so? If there will be a comment period, when will it be available and for how long?

Miigwech,

Renee Keezer

---

**From:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>
**Sent:** Wednesday, June 2, 2021 1:50 PM
**To:** Charlie Lippert <Charlie.Lippert@millelacsband.com>; Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>; waynedupuis@fdlrez.com <waynedupuis@fdlrez.com>; mnorthbird@mnchippewatribe.org <mnorthbird@mnchippewatribe.org>
**Cc:** Katie Draper <Katie.Draper@millelacsband.com>; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** RE: Line 3 Construction Dewatering Permit Amendment request

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Charlie,

Here is map of the Line 3 construction spreads. Hopefully this at a scale that is helpful.

Randall Doneen
CAR Section Manager
Ecological and Water Resources
Minnesota Department of Natural Resources

---

**From:** Charlie Lippert <Charlie.Lippert@millelacsband.com>
**Sent:** Wednesday, June 2, 2021 12:03 PM
**To:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>; Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>; waynedupuis@fdlrez.com; mnorthbird@mnchippewatribe.org
**Cc:** Katie Draper <Katie.Draper@millelacsband.com>; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** RE: Line 3 Construction Dewatering Permit Amendment request

Miigwech Randall for the Final EIS link.
Do you have the file that specifies where each of the five Spreads are?  I ask since the pipeline is slated to be laid approximately 3.6 miles from our East Lake (Minisinaakwaang) community, and approximately 3.2 miles from our Lake Minnewawa (Minweweyaashkaang) community, which the Final EIS in Section 11.2.3 makes no such reference since these are on off-Reservation Trust Parcels, which are—by the way—considered Reservation lands, which when the Department of Commerce did their analysis for the PUC, they could have easily used the US Census Bureau GIS boundary file to determine their location but didn't.  Since where these two communities of the Mille Lacs Band is in a wetland-dominated area, knowing which Line 3's Spread covers that area would be helpful information.
Miigwech miinawaa.
Charlie L.

---

**From:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>
**Sent:** June 2, 2021 09:22

**To:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>; waynedupuis@fdlrez.com; Charlie Lippert <Charlie.Lippert@millelacsband.com>; mnorthbird@mnchippewatribe.org

**Cc:** Katie Draper <Katie.Draper@millelacsband.com>; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>

**Subject:** RE: Line 3 Construction Dewatering Permit Amendment request

Good morning Renee,

As you may know the Minnesota Public Utility Commission was the Responsible Governmental Unit for ensuring Minnesota Environmental Policy Act compliance for the Line 3 Replacement project. Here is a link to the PUC webpage for the Final EIS:

https://mn.gov/eera/web/file-list/13765/

Is there a specific natural resource concern with proposed increase that we should consider addressing? We have focused on ensuring that the water is managed appropriately once it has been appropriated.

Thank you in advance.


Randall Doneen
CAR Section Manager
Ecological and Water Resources
Minnesota Department of Natural Resources


**From:** Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>
**Sent:** Tuesday, June 1, 2021 7:08 AM
**To:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>; waynedupuis@fdlrez.com; 'Charlie.Lippert@millelacsband.com' <Charlie.Lippert@millelacsband.com>; mnorthbird@mnchippewatribe.org
**Cc:** Katie.Draper@millelacsband.com; Monica Hedstrom <Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** Re: Line 3 Construction Dewatering Permit Amendment request

**This message may be from an external email source.**

Do not select links or open attachments unless verified. Report all suspicious emails to Minnesota IT Services Security Operations Center.

Mr. Doneen,

Would you please send me the current Environmental Impact Statement for the Line 3 construction project. I have concerns about the proposed dewatering permits and would like to ensure that it is in compliance with 40 CFR 1508.1. The proposed amendment to the permit is a significant difference in comparison to the original permit.

Renee Keezer

**From:** Doneen, Randall (DNR) <randall.doneen@state.mn.us>
**Sent:** Friday, May 28, 2021 2:19 PM
**To:** waynedupuis@fdlrez.com <waynedupuis@fdlrez.com>; 'Charlie.Lippert@millelacsband.com' <Charlie.Lippert@millelacsband.com>; Renee Keezer <Renee.Keezer@whiteearth-nsn.gov>;

mnorthbird@mnchippewatribe.org <mnorthbird@mnchippewatribe.org>
**Cc:** Katie.Draper@millelacsband.com <Katie.Draper@millelacsband.com>; Monica Hedstrom
<Monica.Hedstrom@whiteearth-nsn.gov>; Harrington, Bradley (DNR) <Bradley.Harrington@state.mn.us>
**Subject:** Line 3 Construction Dewatering Permit Amendment request

CAUTION: This email originated from outside your organization. Exercise caution when opening
attachments or clicking links, especially from unknown senders.
Charlie, Renee, Michael and Wayne:

Thank you for taking the time to meet and discuss the proposed amendment to construction dewatering. I wanted to
circle back on Charlie's question about infiltration rates and give you an update on some other aspects that we
discussed.

Q: What do we know about the infiltration rates in the areas where this water will be discharged?

A: As I had suspected there was not an analysis of infiltration rates for the construction stormwater discharge permit.
I did speak with MPCA staff and they provided this following description of the construction stormwater
requirements.

"– the company is not required to provide an analysis of infiltration rates in the proposed dewatering locations.  The
requirement is their discharge can't cause nuisance conditions in a surface water.  The SWPPP contains various
options for dewatering based on pumping rate and expected sediment load that needs to be removed.  These various
options are evaluated and selected in the field based on the SWPPP and field conditions at the time of dewatering.  If
the selected option is not effective in preventing nuisance conditions, the company needs to move up to the next
higher level of treatment/dewatering method."

In addition the Project's Environmental Protection Plan (EPP) describes the factors that are considered for
constructing and operating dewatering systems. The EPP was too large to attach to this email, but here is an excerpt
from Section 5.0 of the EPP that identifies soil type as a factor that is considered when siting and operating these
systems:

1. **Water Discharge Setting** – This includes:
a. Soil Type – The soil type the discharged water will flow over. The management of
discharged water traveling over sandy soil is more likely to soak into the ground as
compared to clay soils.
b. Ground Surface – The topography in the area that will influence the surface flow of the
discharged water.
c. Adjustable Discharge rate – The flow rate of the discharged water (which may need to
vary) can be managed based on the site conditions to minimize instances of water
from reaching a sensitive resource area such as a wetland or waterbody.
d. Discharge Outfall – The amount of hose and number/size of pumps needed to attempt
to discharge water at a location which drains away from waterbodies or wetlands.

I would also like to report MPCA has reviewed the revised SWPPP and has verified that it contains the requirement for
additional perimeter controls if there is potential for discharges to reach wetlands or surface water. It sounds like
there are still some details to get worked out before the plan is finalized, but it does address the important topic that
was identified.

DNR is meeting with MPCA and Enbridge in the next couple of days to discuss the company's efforts to avoid isolated
depressional wetlands and other surface waters.

Last but not least, it appears that we may be in a position to issue a decision on this request late next week. With that
in mind, please get any additional questions or items to consider as soon as you can next week.

Randall Doneen
CAR Section Manager
Ecological and Water Resources
Minnesota Department of Natural Resources


---------- Forwarded message ----------
From: "Doneen, Randall (DNR)" <randall.doneen@state.mn.us>
To: "tgeshick@boisforte-nsn.gov" <tgeshick@boisforte-nsn.gov>, "waynedupuis@fdlrez.com" <waynedupuis@fdlrez.com>, "samoore@boreal.org" <samoore@boreal.org>, "ben.benoit@llojibwe.net" <ben.benoit@llojibwe.net>, "Katie.Draper@millelacsband.com" <Katie.Draper@millelacsband.com>, "'deb.dirlam@lowersioux.com'" <deb.dirlam@lowersioux.com>, "'gmiller@piic.org'" <gmiller@piic.org>, Amanda Wold <amandaw@uppersiouxcommunity-nsn.gov>, "jleblanc@redlakenation.org" <jleblanc@redlakenation.org>, "monica.hedstrom@whiteearth-nsn.gov" <monica.hedstrom@whiteearth-nsn.gov>, "mnorthbird@mnchippewatribe.org" <mnorthbird@mnchippewatribe.org>, "Darren Vogt (DVogt@1854treatyauthority.org)" <DVogt@1854treatyauthority.org>, "jcoleman@glifwc.org" <jcoleman@glifwc.org>, "tina.brown@ho-chunk.com" <tina.brown@ho-chunk.com>, "linda.nguyen@redcliff-nsn.gov" <linda.nguyen@redcliff-nsn.gov>, "VTateyuskanskan@swo-nsn.gov" <VTateyuskanskan@swo-nsn.gov>, "sarahs@stcroixojibwe-nsn.gov" <sarahs@stcroixojibwe-nsn.gov>, "scott.walz@shakopeedakota.org" <scott.walz@shakopeedakota.org>
Cc: "Harrington, Bradley (DNR)" <Bradley.Harrington@state.mn.us>
Bcc:
Date: Fri, 14 May 2021 19:43:45 +0000
Subject: Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction Dewatering

Tribal Natural Resource Directors:


The Minnesota Department of Natural Resources (DNR) wanted to let you know that we are reviewing a proposal to amend an existing water appropriation permit for the Line 3 pipeline replacement project.  The proposed amendment seeks to increase the total amount of groundwater that can be temporarily dewatered from trenches along the route during construction. The proposed amendment would modify the volume permitted, but not the currently approved dewatering methods, whereby water is removed from the trench, stored, and then infiltrated back into the ground in close proximity to the point of each appropriation. This approach limits the duration of any potential impacts to groundwater levels.


**What is being requested?**


Enbridge is requesting an increase in its total permitted dewatering volume from 510.5 million gallons (MG) to 4,982 MG, an increase of 4,472 MG.  The proposed amendment also seeks an additional 1.8 MG appropriation for construction dewatering of a pipeline maintenance shop. In addition, 3,683 MG of the proposed increase is associated with additional dewatering well point systems that are used to dewater the area around the pipeline trench. The increase in well point systems are proposed on 4 of the 5 construction spreads.

- Spread 2 –  11 well point systems for an additional 700 MG

- Spread 3 – 3 well point systems for an additional 2,720.7 MG

- Spread 4 – 3 well point systems for an additional 25.9 MG

- Spread 5 – 17 well point systems for an additional 236.7 MG

## Why is Enbridge seeking this permit amendment?

The amount of dewatering needed during construction thus far has significantly exceeded what Enbridge anticipated and requested in its original permit application.  The original estimate for construction dewatering was derived from the

previous Alberta Clipper project. The alignment of the Line 3 replacement is different than the Alberta Clipper, especially in the eastern portion or new area of the pipeline project, where the line crosses extensive peatland soil types.

In addition, the company converted to well point systems for dewatering, rather than relying on sump pump dewatering. The company opted to make this shift to assist in meeting construction storm water requirements, as well point systems produce much cleaner water. While the well point systems facilitate meeting construction storm water discharge requirements, it also results in more water being pumped.

The company also has identified a maintenance facility construction effort that will need construction dewatering. This is not part of the corridor, but are required by the Minnesota Public Utility Commission.

## What are the natural resource considerations associated with this amendment request, and how might these be managed?

The total volume of water requested under this amendment application is large, and would be a significant increase to the currently permitted volume. As such, one of the threshold issues to be evaluated is the implications for the water table aquifer.  The temporary nature of the water appropriation and the distribution of the volume across the length of the route are important considerations in this evaluation. As is the case with the existing permit, there would continue to be temporary localized drawdown of groundwater along the corridor, but any water table impacts from this drawdown would be limited because water will be infiltrated back into the ground in close proximity to the point of appropriation.

Another critical issue for evaluation is management of the water discharge to avoid impacts from inundation and/or sedimentation. The Minnesota DNR and Minnesota Pollution Control Agency (MPCA) are working together to evaluate this issue. Current approaches under consideration include:

- Limiting discharge locations near isolated depressional wetlands and other sensitive water resources.

- Additional measures to ensure adequate oversight of dewatering operations at the increased volume being sought.

- Revisions to the Storm Water Pollution Prevention Plan that would require redundant perimeter controls under certain situations.

**Timing for Decision**

Enbridge anticipates reaching the appropriation limit of 510.5 MG under its existing permit in June. The Minnesota DNR will likely make a decision on the water appropriation permit amendment in early June.


If you have any questions or concerns about this request you can email or call me at (651) 259-5156. Alternatively, I am tentatively scheduling a meeting at 3 PM on Thursday May 27 if you would like to join and have more of a group discussion. Details on meeting will be provided shortly.


Randall Doneen

CAR Section Manager

Ecological and Water Resources

Minnesota Department of Natural Resources

---

**3 attachments**

📄 **2021-06-04-2018-3420_88164_permit_issued.pdf**
199K

📄 **2021-06-04-Line3-2018-3420Amendment-FOF.pdf**
547K

📄 **Line 3 Replacement Project - Proposed Amendment to Water Appropriation for Construction**

**Dewatering.eml**
24K

# EXHIBIT I



**DEPARTMENT OF
NATURAL RESOURCES**

July 6, 2021

Mr. Frank Bibeau
Executive Director
1855 Treaty Authority
PO Box 418
White Earth, MN 56591


Dear Mr. Bibeau:

Thank you for your correspondence dated June 1, 2021 (White Earth off reservation tribal court
And Chippewa treaty protected uses of public lands) and June 7, 2021 (Protection of wild rice,
wild rice waters of the Chippewas' of the Mississippi; Shell River and Rights of Manoomin).
We appreciate the interest of the 1855 Treaty Authority in the issues raised in your letters.

Consistent with Governor Walz's Executive Order 19-24 and the long-standing practice of the
Minnesota Department of Natural Resources, we would welcome the opportunity for
government-to-government consultation with the White Earth Nation, Leech Lake Band of
Ojibwe, and/or Mille Lacs Band of Ojibwe on the issues you have raised, upon the request of the
relevant tribal council(s).


Sincerely,

Sarah Strommen
Commissioner

**Minnesota Department of Natural Resources | Commissioner's Office**
**500 Lafayette Road North, St. Paul, Minnesota 55155**
www.dnr.state.mn.us

Equal Opportunity Employer
*This material is available in alternate formats.*